IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| GENERAL ELECTRIC COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| GLOBAL FIBERGLASS SOLUTIONS | ) | |
| OF TEXAS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## **COMPLAINT**

Plaintiff General Electric Company ("GE" or "Plaintiff"), as and for its complaint against Defendant Global Fiberglass Solutions of Texas, LLC ( "GFS"), hereby alleges as follows:

### **Nature of the Action**

1.      This is a case about fraud and deception. Through two Blade Recyling Agreements by and between GE and GFS, dated June 9, 2017, and January 10, 2018 (collectively, the "Agreements"), GE contracted with GFS to remove and recycle approximately 5,000 wind turbine blades. Disputes have arisen between the parties concerning GE's rights and GFS's obligations under these Agreements. Specifically, although GFS claims it satisfied its obligations when it purportedly "disposed of" the subject blades, GFS induced GE to enter into the Agreements based on a false promise that the blades would be recycled by GFS following their removal from GE's customer sites.[1] As a result of the parties' negotiations, the Agreements

---

[1] Generally, GE manufactures and supplies wind turbine equipment (including blades) for customers who own and/or operate wind farms.  In many cases, customers contract with GE to service the wind turbine farm.  The blades at issue in this case were removed from service to be replaced with newer upgraded equipment.

themselves provided that GFS was to recycle the blades. And GFS continued its wrongful and fraudulent conduct by consistently reassuring GE over the course of the parties' relationship that it was actively recycling the relevant blades.

2.      Through this lawsuit, GE seeks to hold GFS responsible for fraudulently inducing GE to enter into the Agreements, subsequently breaching the Agreements, commiting fraud, and for breaching the implied covenant of good faith and fair dealing. GE also seeks a declaration that, under the plain terms of the Agreements, GFS is required to indemnify GE from any current, third-party demands.

3.      Starting with GE's fraudulent inducement claim, GFS consistently represented to GE throughout negotiations that it would recycle the subject blades. Specifically, as an inducement for GE to enter into the Agreements, GFS made multiple promises leading up to the execution of both the first and second agreements that it was a leader in wind turbine blade recycling and had environmental concerns at the forefront of its business. GFS even hosted GE on its manufacturing site in Texas to demonstrate firsthand its so-called patented, world-premier wind turbine recycling process, whereby GFS recycled wind turbine blades into pellets that could, in turn, be used in a variety of recycled products. As a result, GE paid a premium to GFS because GE believed it was hiring a premier, environmentally-conscious corporate citizen that ultimately would recycle the blades. Indeed, the Agreements at the center of this dispute are titled "Blade Recycling Agreement[s]," which leaves no doubt that GE believed GFS ultimately would recycle the blades.

4.      Turning to the breach of contract claim, under the Agreements, the blades were to be recycled. The Agreements provided that the blades were to be "disposed of by cutting [them] into moveable pieces ([GFS's] discretion) on [GE's] customer[] site[s] and then moved to an off-

site area managed by [GFS]." To that end, the Agreements incorporated a GFS PowerPoint presentation, which provided an overview of the recycling process. Over the course of several years, GFS removed thousands of blades from GE's customer sites (collectively, the "Blades").

5.    As the Agreements contemplate, GFS invoiced GE for completion of the services within forty-eight hours of completion of those services at each site. GE ultimately paid GFS approximately $16,900,000 under the Agreements for its services, with the consistent expectation that GFS would ultimately recycle the Blades consistent with the terms of the Agreements.

6.    But GE later discovered that GFS was acting contrary to the implied covenant of good faith and fair dealing, as well as the expectation of GE upon entering into the Agreements and the terms thereof. Specifically, GE learned that GFS merely stockpiled the Blades it obtained from GE's customer sites (as well as blades from other customers) at various locations, where they simply sat for years without GFS taking any steps to recycle them. GFS's conduct surprised GE, as GFS represented itself during negotiations as a reputable vendor in wind turbine blade recycling—all in order to induce GE to engage GFS for the recycling of the Blades from GE's customer sites.

7.    When pressed on the lack of recycling, GFS fraudulently claimed that it was, in fact, recycling the Blades. Only after GFS took millions of dollars from GE, did GFS all but shut down its operations without recycling the Blades. In sum, GFS grossly misrepresented its capabilities during negotiations and never intended to recycle the Blades. GE would not have paid a premium to a purported reputable vendor in recycling if it had known the truth. The foregoing dispute forms the basis for GE's fraudulent inducement, breach of contract, fraud, and breach of the implied covenant of good faith and fair dealing claims against GFS. As a direct and

proximate result of GFS's actions, GE incurred damages—namely, the amounts paid to GFS under the relevant purchase orders, as well as pre- and post-judgment interest, attorneys' fees, and costs. GE has also suffered harm to its reputation as a result of the publicized nature of the events.

8.      GE also requests declaratory relief concerning GFS's indemnity obligations, as GE has not only received demands from two third parties (one individual party and one governmental agency) concerning GFS's alleged improper storage of wind turbine blades, including Blades subject to the Agreements, but it also was required to engage a third-party, credible recycling vendor to perform substitute performance to recycle the relevant blades—all in order to address the third-party demands and litigation. In that regard, and in accordance with the Agreements, GE promptly sent GFS requests for indemnification related to the third-party demands. GFS initially responded to GE and confirmed its indemnity obligation to GE, but it again went silent—refusing to respond to any of GE's requests for indemnification. Based on the foregoing, GE requests that the Court issue declaratory relief to prevent and limit further controversies concerning the Agreements.

## Parties

9.      GE is a corporation organized under the laws of the State of New York, with a principal place of business in Schenectady, New York. GE produces innovative solutions that deliver essential energy, healthcare, and transportation infrastructure. Its Renewable Energy business involves the engineering of energy products, grid solutions, and digital services for customers around the world and, relevant here, includes the manufacturing of wind turbines to generate energy.

10.     GFS is a Texas limited liability company formed on March 14, 2017, with its principal place of business in Washington at 16212 Bothell Everett Highway Suite F203, Mill Creek, Washington, 98012.  GFS may be served through its registered agent named Corporation Service Company, 211 E 7th Street, Suite 620, Austin, Texas, 78701.  Based on GFS's most recent annual filing with the Texas Secretary of State (from 2020), on information and belief, GFS has two members—Donald Lilly and Ronald Albrecht—who are each citizens of Washington.[2]

## Jurisdiction and Venue

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1). The parties are citizens of different states. The amount in controversy, exclusive of interest and costs, exceeds $75,000.

12.     This Court has personal jurisdiction over GFS and venue is proper because the Parties agreed that, "[l]itigation may be brought only in the U.S. District Court for the Southern District of New York . . . ." Ex. B (First Agreement) at App. C § 20.2; Ex. E (Second Agreement) at App. C § 20.2. In so doing, the Parties agreed to "submit to the jurisdiction of [this Court] and waive any defense of forum non conveniens." *Id.*

---

[2] GE may rely on the phrase "on information and belief" because, although the most recent filing reflects that the members of GFS are Donald Lilly and Ronald Albrecht, the identity of GFS's members is uniquely within that entity's possession, as it is contained in the privately-held register of members. *Arista Records Ltd. Liab. Co. v. Doe*, 604 F.3d 110, 120 (2d Cir. 2010) (explaining that a plaintiff may "plead[] facts alleged 'upon information and belief' where the facts are peculiarly within the possession and control of the defendant"); *see also Bank of N.Y. Mellon v. Astoria Trails N. Homeowners Ass'n*, No. 2:15-cv-00366-APG-CWH, 2016 U.S. Dist. LEXIS 71260, at *4 (D. Nev. May 27, 2016) ("At the beginning of the case, a plaintiff may plead jurisdictional facts that are not reasonably ascertainable on information and belief. However, if the defendant controverts or challenges those allegations, then the plaintiff must establish the jurisdictional facts." (citing *Carolina Cas. Ins. Co. v. Team Equip., Inc.*, 741 F.3d 1082, 1087 (9th Cir. 2014))).

13.     This Court has authority pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, to grant declaratory relief in favor of GE.

## General Allegations

14.     As part of its Renewable Energy business, GE supplies wind turbine blades to wind farm owners and operators across the country and, in many cases, will contract with those customers to service their wind turbine farms. Each wind turbine has blades that are made primarily of fiberglass. The blades may be replaced during turbine improvement, otherwise known as "repowering." This process entails upgrading specific elements of the turbine to improve its efficiency and lifespan, without replacing the entire machine.

15.     GE has pledged to support improved sustainability. In furtherance of that pledge, GE actively seeks alternatives to sending decommissioned blades to landfills.

### The Agreements

16.     In or around 2016, GE engaged in discussions with GFS, along with several other potential vendors, concerning blade recycling needs. During the parties' discussions, GFS assured GE that it had the requisite capability, financing, and overall infrastructure to recycle the Blades at GE's customer sites. GFS also represented that it was an experienced company on the cutting edge of fiberglass recycling and maintained environmentally-friendly goals like GE. GFS provided GE with a Customer Presentation supporting these representations, which reflected, in part, the following:

## Wind Blade Recycling

 Economical • Efficient • Safe • Clean



- ✓ Full EHS compliance and low foot print on the farm
- ✓ Low/no dust and debris process
- ✓ Customer EHS sign off at all work locations/towers
- ✓ Efficient cutting and hauling operation for minimal interference with other work on the wind farm
- ✓ Extensive safety protocol and equipment for workers
- ✓ Nationwide service, years of experience, competitive pricing
- ✓ Daily and weekly reporting on work progress, documenting blades cut/moved and tower pads cleared
- ✓ EPA tie in for recycling credit and recycling certificate listing all blade serial numbers
- ✓ Optional joint PR actions on recycling efforts
- ✓ Option to purchase products made from the blade material at discounted rates

## From feedstock to recycled product

The material is further processed into manufacturing grade fibers that can be used for manufacturing a number of recycled products, such as pallets, composite panels and manhole covers.

  



A true and correct copy of the Customer Presentation is attached as Exhibit A.

17.     GE was aware of GFS's representation in the 2017 publication of "Recycling Technology" that GFS was collaborating with researchers at Washington State University to develop its cutting-edge method of recycling. GFS also visited GE's headquarters in Schenectady, New York, and provided GE with examples of finished products that purportedly contained recycled wind turbine blade materials. During negotiations, GFS further hosted GE at multiple sites for demonstrations of GFS's ability to recycle the Blades from customer sites by cutting them in an environmentally safe manner. Based on these discussions, GE understood that, as GFS represented in its correspondence with GE on or about March 13, 2017, "[p]roduction capacity [was] in place," and Vietnam could serve as "a production back-up." In other words, GE believed GFS was fully capable of recycling the Blades. GE even expected that it would have the opportunity to sell the products GFS produced with the recycled blade materials.

18.     Based on these and other similar representations, GE selected GFS as the vendor to recycle Blades at its customer sites, believing GFS's price included transportation, cutting, and recycling with proof of destruction.

19.     As a result, on or about June 9, 2017, GFS and GE negotiated and executed the First Blade Recycling Agreement (the "First Agreement") for the recycling of an estimated 2,136 Blades from sites in Iowa and Texas for the price of $3,600 per Blade. A true and correct copy of the First Agreement is attached as Exhibit B. The First Agreement terminated on December 31, 2018, by its terms.

20.     As set forth in the First Agreement, GFS was required to "dispose" of the Blades within one week of their removal from turbines on GE's customer sites.[3] "Disposal" is defined in the Statement of Work, found at Appendix A to the First Agreement, as follows:

> [GFS] shall dispose of the wind turbine blades no later than one (1) week after they have been taken down . . . . *Blades shall be disposed of by cutting the blades into moveable pieces ([GFS] discretion) on the customer site and then moved to an off-site area managed by [GFS]*. [GFS] shall determine final use of blades, however sending the wind turbine blades and or material generated in the recycling process to a landfill is prohibited unless expressly approved by [GE].

Ex. B (First Agreement) at App. A (emphasis added).

21.     The First Agreement incorporates a GFS PowerPoint presentation, which provides a "general overview" of GFS's recycling process. *Id.* at App. A (appended thereto as Ex. 2). GE relied upon the GFS PowerPoint, as well as oral promises from GFS concerning its intent to recycle the Blades in selecting GFS over other recycling vendors. GE would not have entered the First Agreement absent its understanding that GFS intended to recycle the Blades.

22.     The First Agreement also contains an indemnity provision ("Indemnity Provision"), whereby GFS agreed to

> defend, indemnify, release and hold [GE] and its Affiliates, and each of its and their directors, officers, managers, employees, agents, representatives, successors and assigns (collectively, the "Indemnitees") harmless from and against any and all claims, legal actions, demands, settlements, losses, judgments, fines, penalties, damages, liabilities, costs and expenses of any nature whatsoever, including, all attorneys' fees (collectively, "Claims") arising from any act or omission of [GFS], its agents, employees or subcontractors (collectively, "Supplier Personnel"), except to the extent attributable to the sole and direct gross negligence of [GE]. .

---

[3] Further to the point, the First Agreement explains that "[t]he relationship of [GE] and [GFS] is that of independent contractors," expressly noting that "[n]othing in this Order shall be interpreted or construed as creating or establishing the relationship of employer and employee between [GE] and [GFS] . . . ." Ex. B (First Agreement) at App. C. § 22.1.

> . . [GFS] further agrees to indemnify [GE] for any attorneys' fees
> or other cost [GE] incurs to enforce it [sic] rights hereunder.

*Id.* at App. C. § 12.1.

The First Agreement provides that GFS "shall perform the services and work hereunder in a competent, safe, and professional manner in accordance with the highest standards and best practices of [GFS's] industry." *Id.* at App. C. § 9.1. Relatedly, GFS "represent[ed], warrant[ed], certifie[d] and covenant[ed] ('Covenants') that it shall comply with all laws, treaties, conventions, protocols, regulations, ordinances, codes, standards, directives, orders and rules issued by governmental agencies or authorities which are applicable to the activities relating to this Order . . . ." *Id.* at App. C. § 15.1.

23.    In accordance with the definition of "disposal," following the removal of Blades from a customer site, which had to occur within a week of taking down the Blades from the turbines, GFS would invoice GE, noting the "Project Completion."

24.    For instance, on January 30, 2018, GFS represented to GE, "Per the attached report, the blade removal at Cap Ridge 4 has been completed."

25.    Finally, the First Agreement notes,

> All provisions or obligations contained in this Agreement, which
> by their nature or effect are required or intended to be observed,
> kept or performed after termination or expiration this Agreement
> will survive and remain binding upon and for the benefit of the
> parties, their successors, including without limitation successors by
> merger, and permitted assigns.

*Id.* at § 6.2.

26.    In November 2017, GFS sent a summary of work completed and ongoing in 2017 involving 2,000 blades:

From: Ronald Albrecht [mailto:ronald@globalfiberglasssolutions.com]
Sent: Thursday, November 16, 2017 8:03 PM
To: Lutomski, Shanon (GE Renewable Energy) <shanon.lutomski@ge.com>
Cc: 'Don Lilly' <donl@globalfiberglasssolutions.com>
Subject: EXT: RE: Recycling Update

Hi Shanon,

Here is the comparison for 2017 contract and 2017 POs:

Per contract - 80%: 2136 blades
Current POs issued: 1515 blades
All projects in progress: 2034 blades

| Project | Blades | PO | Status |
|---|---|---|---|
| Red Canyon | 168 | 210004001 | 100% completed |
| Cap Ridge I (Goat MTN) | 429 | 210004012 | 65% completed |
| Cap Ridge III | 360 | 210004013 | Not started |
| Cap Ridge IV | 225 | Not issued | Not started |
| Victory | 198 | Not issued | In progress |
| Century/Wall Lake | 300 | 210005802 | In progress |
| Intrepid | 321 | Not issued | 20% completed |
| Sweetwater I & II | 258 | 210005015 | 30% completed |
| New Mexico WEC | 408 | Not issued | Not started |

As for the 2018 projects, do you have the blade sizes?

Thanks!

-Ron

A true and correct copy of this correspondence is attached as Exhibit C.

27.    In December 2017, GFS also prepared a "Blade Materials Distribution Projection for 2018," which showed a projection of the end-use products GFS represented that it would produce with the recycled materials from wind turbine blades:



Blade Material Distribution Projection for 2018



A true and correct copy of this document is attached as Exhibit D.

28.    Based on GFS's representations concerning successful completion of various projects and its use of recycled materials to create end-use products, GE had no knowledge of any violations or breaches of the First Agreement. Thus, on or about January 10, 2018, GFS and GE negotiated and executed the Second Blade Recycling Agreement (the "Second Agreement") for the recycling of an estimated 2,745 Blades from sites in Iowa and Texas for the price of $3,525 per Blade. The Second Agreement, a true and correct copy of which is attached as Exhibit E, contained the same substantive terms as the First Agreement and was set to terminate on December 31, 2019. As with the First Agreement, GE would not have entered the Second Agreement absent its understanding that GFS intended to recycle the Blades.

<u>GFS's Failure to Comply with the Agreements and Its Attendant Representations to GE</u>

29.    In or about February 2018 and with knowledge that it had *not* been recycling the Blades from GE's customer sites, GFS nevertheless continued to represent to GE that it was recycling blades and, indeed, working with regulatory agencies on best practices for recycling. In that regard, GFS represented the following to GE:

> We feel confident that our process compares very favorably to landfilling wind blades . . . We're also closely cooperating with the US and State Environmental Protection Agencies. . . . We have some data for internal planning purposes and are also working with a US University to get a more complete assessment done.

A true and correct copy of this correspondence is attached as Exhibit F. GFS also provided GE with "an overview of the dramatic difference [GFS] and repurposing operations is having in softening the environmental impact of wind power generation." A true and correct copy of this correspondence is attached as Exhibit G.

30.    Following reports concerning GFS, GE visited GFS's Sweetwater, Texas recycling plant in late 2018. During this visit, GE observed that the facility did not appear to be in full operation. As a result, on or about December 18, 2018, GE sent a demand to GFS, demanding that GFS cure the breach of the Agreements within ten (10) days and explaining therein that it had "recently discovered that GFS[] has failed to recycle—or even shred—any (or nearly any) of the approximately 5,000 blades that GE has provided to GFS[] and for which GE has made payments to GFS[]."

31.    In response, GFS sent the following to GE on or about December 21, 2018, a true and correct copy of which is attached as Exhibit H:

To date, GFS has completely disposed of approximately 4900 wind turbine blades for GE in compliance with the Agreements' Statement of Work . . . We remind you that, having already disposed of over 4900 blades, GFS took title to these blades and GE has no further responsibility associated with those blades. GFS takes responsibility for those blades in accordance with the Agreements.

32.    In or about January 2019, GFS sent further correspondence to GE with the following date- and time-stamped photographs of its Sweetwater, Texas recycling site, purporting to demonstrate its capability to recycle the decommissioned Blades.





Photograph 3: January 11, 2019 at 9:53:36 a.m.



Stage 3: primary breakdown of blade section material

Jan 11, 2019 9:53:36 AM
11 Industrial Street
Sweetwater
Nolan County
Texas

Photograph 4: January 11, 2019 at 10:05:02 a.m.



Stage 4: scrap frp production & refinement

Jan 11, 2019 10:05:02 AM
13 Industrial Boulevard
Sweetwater
Nolan County
Texas

Photograph 5: January 11, 2019 at 10:15:43 a.m.



Stage 5: batch mixer setup

Jan 11, 2019 10:15:43 AM
15 Industrial Street
Sweetwater
Nolan County
Texas

Photograph 6: January 11, 2019 at 10:18:59 a.m.



Stage 6: pellet production & refinement

Jan 11, 2019 10:15:13 AM
15 Industrial Street
Sweetwater
Nolan County
Texas

Photograph 7: January 11, 2019 at 10:15:13 a.m.



Photograph 8: January 11, 2019 at 10:26:21 a.m.



Photograph 9: January 11, 2019 at 10:17:45 a.m.



Photograph 10: January 10, 2019 at 2:31:32 p.m.



A true and correct copy of this correspondence is attached as Exhibit I. Based on the foregoing, GFS explained therein,

> Collectively, these photos demonstrate that GFS[] has both the capability and the present operations to transform used 37 meter fiberglass blades into their component parts, in a form easily reusable in the marketplace. Although this proprietary system continues to evolve and become more efficient, GFS[]'s ability and intent to fully recycle decommissioned blades has never been in doubt. None of the blades decommissioned by GFS[] have ever been in [sic] placed in a landfill, and all have either been fully shredded and processed or are set to be in the near future.

33.     Around this time, GFS also informed GE that its operation was "transitioning into a bigger facility . . . that [was] more in line with [its] processing setup in [its] TX facility." In that regard, in or about March 2019, GFS indicated that its goal was to secure GE as its "primary industrial partner."

34.     In or about November 2019, GFS continued to represent to GE that it was making progress on recycling the Blades: "[W]e're making progress with investors and revenues are picking up for us as well. We're continuing to manage the GE blades in an orderly fashion and hope to make significant progress in the breakdown of the blades in 2020."

35.     In sum, GFS consistently represented to GE that it was capable of recycling the Blades, and it made numerous representations that it not only was capable of recycling the Blades, but that it *was* recycling the Blades.

36.     In line with these representations, GFS's website continued to claim that it "offers pioneering fiberglass recycling and green-product manufacturing. [GFS] helps wind energy and other industries avoid landfills, build customer trust, and achieve true sustainability":



# GLOBAL FIBERGLASS SOLUTIONS
### Helping to reduce the world's carbon footprint

| HOME | ABOUT US | SERVICES | PRODUCTS | MEDIA | CONTACT US |

**Fiberglass recycling is here. Finally.**

Global Fiberglass Solutions offers pioneering fiberglass recycling and green-product manufacturing.

We help wind energy and other industries avoid landfills, build customer trust, and achieve true sustainability.

## Industrial fiberglass recycling

From wind turbine blades to marine craft and more, GFS dismantles, transports, and recycles your large-scale fiberglass using a first-of-its-kind process. Your waste stream is verified and transparent at every step thanks to our SourceTracker® software.



## Recycled fiberglass products

Once GFS processes fiberglass into raw material, we then create versatile, customized products such as composite panels, railroad ties, plastic composites, and beyond. You can order fibers or our EcoPoly pellets in bulk to make your own products.



## Landfill or incinerator. 2 bad choices.

Yet until recently these were the only disposal options for fiberglass waste.



Wrong for the environment, and wrong for clean energy companies with reputations to protect.

Add rising fees, regulations, and customer demand for accountability, and now retired fiberglass becomes a massive global problem.

In 2009 CEO Don Lilly launched GFS to find a better way. After years of breakthrough development, GFS now offers sustainable recycling and a second life for fiberglass composite material.



## Why choose GFS?

**Protect your reputation**
Keep your company's sustainability record strong and accountable while building customer trust.

**Reduce risk**
Future-proof against potential regulations or liabilities of landfilling or incineration.

**Leave landfills behind**
Avoid rising tipping fees and a negative environmental legacy through a zero-waste process.

**Cost-neutral solution**
GFS recycling can lead to potential tax/carbon credits and better financing rates.

**Gain competitive edge**
Separate from competitors with an advanced disposal system that's verifiable at every step.

**Join global leadership**
Partner with leading edge of sustainability movement and support the circular economy.

# 99%
of a wind blade can be recycled by GFS

# 400
### million tons
fiberglass waste one company can produce in a year

# $24
### billion
annual fiberglass industry revenue expected by 2024*
*MarketsandMarkets ™*









A true and correct copy of the contents of GFS's website, which is no longer active, is attached as Exhibit J.

37.    Notwithstanding all of GFS's fraudulent misrepresentations, in fact, GFS never had the infrastructure to process the volume of Blades subject to the Agreements. On the date of expiration for the Second Agreement, GFS had removed approximately 5,000 Blades from GE's customer sites.   GE cannot be certain that any of these Blades have been recycled, notwithstanding that GE paid GFS approximately $16,900,000 under the Agreements, with the expectation and belief that GFS would ultimately recycle the Blades pursuant to the terms of the Agreements.

<u>Third-Party Claims</u>

38.     In or about December 2019, GFS received a Letter of Inquiry from the Iowa Department of Natural Resources ("IADNR"), inquiring whether GFS was improperly storing blades at certain GFS locations in Iowa. In or about March 2020, GFS received a Notice of Violation, as the IADNR determined that GFS was not properly storing the blades in question.

39.     GE requested information from GFS related to the Letter of Inquiry and sent another demand on or about July 7, 2020, to GFS, explaining therein that there was "no evidence GFS[] . . . actually recycled any of the approximately 5,000 blades that GE provided to GFS[] in 2017-2018 and for which GE has made payment to GFS[]."

40.     In or about July 2020, GFS responded to GE that it had no obligation under the Agreements to recycle the Blades:

> There is no performance obligation to recycle the blades, *even though the parties admittedly contemplated that the blades were intended to be recycled by GFS*[]. GFS[]'s only continuing obligation to GE concerning the handling of the blades is not to send them to a "landfill" . . . although GFS[] had developed the technology to pelletize the blades, GFS[]'s practical ability to complete palletization [sic] on the grand scale contemplated was dependent upon, inter alia, additional infrastructure that would be built using the revenue anticipated from future purchase orders from GE.

A true and correct copy of this letter is attached as Exhibit K (emphasis added).

41.     In that same correspondence, GFS addressed GE's request for indemnity related to possible IADNR third-party demands against GE. GFS was clear in conceding that it owed indemnity to GE related to third-party claims, although it stated there was no pending or threatened third-party claim against GE:

> GFS[] agrees that it has the obligations agreed to in Sections 12.1 and 12.2. However, there is no pending or threatened third party claim of which GFS[] is aware, and until such claim arises (if ever), GFS[]'s defense and indemnity obligations do not arise.

42.    In the meantime, an owner of one of the GFS-leased sites (Phoenix Newton Industrial Investors, LLC ("Phoenix Newton")) received a Notice of Violation from the IADNR in or about September 2020.

43.    In or about October 2020, GE conducted another site-visit to GFS's Sweetwater, Texas facility and again observed that the facility did not appear to be in full operation.

44.    On or about December 4, 2020, counsel for Phoenix Newton sent a Notice of Intent to Pursue Citizen Action against GE.

45.    In or about December 2020, GFS executed a Consent Order with the IADNR, which states that "no blades have been recycled" and that GFS is instead stockpiling them at several sites in Iowa.

46.    In response, on or about January 20, 2021, GE again sent notice to GFS regarding GFS's failure to recycle the Blades, notifying it of the third-party threatened claim by Phoenix Newton and seeking indemnification. A true and correct copy of this letter is attached as Exhibit L. GFS did not respond to GE's request for indemnification. However, GFS did send an email response directly to Phoenix Newton, on or about January 18, 2021, in which GFS stated that GFS "alone owns the blades. GE is not a proper defendant under either category of the asserted claims." GFS further stated that it was "also making arrangements for removal of the blades from the Newton[, Iowa] facility."

47.    On or about September 26, 2022, the Iowa Department of Justice, Office of the Attorney General (the "Iowa AG's Office") informed GE that it

> intends to file a civil environmental enforcement action against
> GFS (and a number of GFS-related entities), Donald Lilly, Ronald
> Albrecht, and GE in Jasper County District Court to enforce
> Iowa's solid waste laws against GFS, GE, et al., permanently
> enjoin them from future violations, and to seek the maximum civil
> penalty allowed by law.

A true and correct copy of this letter is attached as Exhibit M.

48.    In response, on or about October 21, 2022, GE notified GFS of the third-party threatened claim and sought indemnification. A true and correct copy of this letter is attached as Exhibit N. To date, GE has not received a response from GFS and does not expect that one will be forthcoming.

49.    On or about December 22, 2022, GE entered an agreement with the Iowa AG's Office (the "Iowa AG Agreement") whereby GE would finance the recycling of the Blades in order to avoid litigation, further harm to reputation, and, most importantly, because GFS would not abide by its obligations under the Agreements. A false narrative on the terms of this Agreement were subsequently publicized, leading GE to suffer further harm to its reputation as a result.

50.    Pursuant to the Iowa AG Agreement, GE sent a Notice of Procurement of Alternative Services to GFS on or about May 16, 2023, to advise GFS that, under the terms of the Agreements, it would be contracting with another vendor to recycle the Blades due to GFS's failure to do so. A true and correct copy of this letter is attached as Exhibit O. To date, GE has not received a response from GFS and does not expect that one will be forthcoming.

51.    All told, GE has paid approximately $16,900,000 to GFS under the Agreements. GE has also incurred significant additional costs and expenses in connection with GFS's disputes with its landlords and regulators—namely, under the terms of the Iowa AG Agreement, GE has

engaged a third-party vendor to recycle the Blades and will incur approximately an additional $5,500,000 as a result.

## COUNT I

### (Fraudulent Inducement)

52.     GE repeats and realleges the allegations of paragraphs 1-51 of its complaint as if fully set forth here.

53.     GE discovered GFS during its search for a reputable company to recycle the decommissioned Blades because GFS represented itself as an innovative leader in the fiberglass recycling industry with "Nationwide service, years of experience, [and] competitive pricing," as reflected in GFS's Customer Presentation to GE. GFS consistently represented itself as such during discussions with GE, assuring GE in the process that—as an experienced company on the cutting edge of the fiberglass recycling industry—it had the requisite capability, financing, and overall infrastructure to recycle the Blades at GE's customer sites. Moreover, it emphasized its environmentally-friendly vision that tracked GE's pledge to support improved sustainability.

54.     In line with the foregoing, in an effort to induce GE to execute the Agreements, GFS made multiple representations that it would recycle the Blades. Indeed, the Agreements contemplate that GFS would recycle the Blades. This was evidenced in part by GFS's Customer Presentation to GE during their initial discussions, which outlined GFS's process, including "From blade sections to bags of feedstock" and "From feedstock to recycled product." It also was evidenced by the inclusion of a GFS PowerPoint presentation in the Agreements, which provides GE with a "general overview" of GFS's recycling process. Indeed, GE's internal documents reflect that, when selecting GFS, it believed GFS's pricing included "transportation, cutting, [and] recycling with proof of destruction." And GFS conceded in its correspondence

with GE in or about July 2020 that "the parties admittedly contemplated that the blades were intended to be recycled by GFS[]."

55.    GE actually relied on these and other similar representations, selected GFS over the other prospective vendors as its blade recycling servicer, and, in turn, executed the Agreements with GFS with the understanding that GFS would recycle the Blades. Specifically, given GE's pledge to support improved sustainability, GFS's representations that it would ultimately recycle the Blades materially induced GE to execute the "Blade Recycling Agreements" with GFS because, as part of its Renewable Energy business, GE actively seeks out alternatives to sending its wind turbine blades to landfills, and GFS offered such an alternative.

56.    GFS made these representations with full knowledge of their falsity, as GFS never intended to recycle the Blades and did not have the capability to recycle the volume of Blades. This is evidenced by GFS's efforts to maintain the pretext that it would recycle the Blades over the course of several years, while recycling few, if any, of them. GFS's representations include, but are not limited to, the following:

(a)    In or about February 2018, GFS represented to GE that its recycling process was operational, explaining, "We feel confident that our process compares very favorably to landfilling wind blades . . . We have some data for internal planning purposes and are also working with a US University to get a more complete assessment done." At this time, GFS also provided GE with "an overview of the dramatic difference [GFS] and repurposing operations is having in softening the environmental impact of wind power generation";

(b)     In or about December 2018, GFS informed GE that its operation was "transitioning into a bigger facility in Newton, IA that [was] more in line with [its] processing setup in [its] TX facility";

(c)     In or about January 2019, GFS provided GE with date- and time-stamped photographs of its Sweetwater, Texas recycling site, purporting to demonstrate its process and capability to recycle the decommissioned Blades;

(d)     In or about November 2019, GFS represented to GE that it was making progress on recycling the Blades: "[W]e're making progress with investors and revenues are picking up for us as well. We're continuing to manage the GE blades in an orderly fashion and hope to make significant progress in the breakdown of the blades in 2020"; and

(e)     GFS continued to tout on its website that it "offers pioneering fiberglass recycling and green-product manufacturing. [GFS] helps wind energy and other industries avoid landfills, build customer trust, and achieve true sustainability."

57.     After execution of the Agreements, GE fully believed that GFS was recycling the Blades in good faith. Indeed, following GE's discovery that the GFS facility in Sweetwater, Texas, did not appear to be operating, GFS sent "multiple time-stamped photos" of its "fiberglass pelletizing operations" in January 2019 to "document[] the operations at its processing facility in Sweetwater, Texas." By consistently sending proof of recycling operations, GFS continued its fraud on GE at every turn. It was only after receipt of third-party complaints regarding GFS that

GE surprisingly learned that GFS apparently had recycled only few, if any, of the Blades, and, instead, was stockpiling them through rental agreements with property owners.

58.     GE subsequently sent further demands to GFS regarding GFS's failure to recycle the Blades. In response, GFS claimed that "[t]here [was] no performance obligation to recycle the blades, even though the parties admittedly contemplated that the blades were intended to be recycled by GFS[]." GFS's characterization effectively demonstrates that it executed a bait-and-switch scheme against GE.

59.     Upon information and belief, to date, GFS has recycled few, if any, of the subject Blades. GFS's conduct was therefore fraudulent and in bad faith.

60.     GE would not have entered into the Agreements absent its understanding that GFS intended to recycle the Blades and, in fact, it paid a premium to GFS of approximately $16,900,000 as a result.

61.     As a direct and proximate result of GFS's fraudulent inducement of GE, GE incurred significant costs and expenses in connection with GFS's disputes with its landlords and regulators.

62.     As a result of GFS's fraudulent inducement of GE, GE will continue to suffer monetary damage in an amount to be proven at trial, but reasonably believed to be the difference between the cost of standard disposal for the subject Blades and the premium GE paid GFS ($16,900,000), the amounts to be incurred in securing alternative services ($5,500,000), and the harm to reputation that GE has suffered based on these events.

## COUNT II

### (Breach of Contract)

63.      GE repeats and realleges the allegations of paragraphs 1–62 of its complaint as if fully set forth here.

64.      The Agreements, entered into June 9, 2017, and January 10, 2018, respectively, by and between GE and GFS, were valid and binding contracts that provided GFS would recycle the Blades. This is clearly evidenced by the inclusion of a GFS PowerPoint presentation in the Agreements, which provides GE with a "general overview" of GFS's recycling process.

65.      GE fully performed its obligations under the Agreements, including but not limited to paying GFS $16,900,000 for its recycling services.

66.      In or about October 2018, GE became aware that GFS was not recycling the Blades in compliance with the Agreements.

67.      GE made an appropriate demand on GFS pursuant to the terms of the Agreements by sending three notices of default on December 18, 2018, July 7, 2020, and January 20, 2021, respectively.

68.      GFS materially breached its duties to GE under the Agreements by failing to recycle the Blades and by failing to timely cure upon receipt of GE's three notices of default.

69.      Upon information and belief, to date, GFS has failed to recycle the GE blades stockpiled in Iowa.

70.      As a result of GFS's failure to perform under the Agreements, GE will continue to suffer monetary damage in an amount to be proven at trial, but reasonably believed to be the difference between the cost of standard disposal for the subject Blades and the premium GE paid

GFS ($16,900,000), the amounts to be incurred in securing alternative services ($5,500,000), and the harm to reputation that GE has suffered based on these events.

**COUNT III**

**(Common Law Fraud)**

71.    GE repeats and realleges the allegations of paragraphs 1–70 of its complaint as if fully set forth here.

72.    GFS had a duty to truthfully represent to GE its progress under the Agreements. After executing the Agreements, GFS purposefully misled GE on an ongoing basis by representing that it was capable of recycling the Blades and/or making progress on recycling the Blades subject to the Agreements, including but not limited to the following misrepresentations:

(a) In or about February 2018, GFS represented to GE that its recycling process was operational, explaining, "We feel confident that our process compares very favorably to landfilling wind blades . . . We have some data for internal planning purposes and are also working with a US University to get a more complete assessment done." At this time, GFS also provided GE with "an overview of the dramatic difference [GFS] and repurposing operations is having in softening the environmental impact of wind power generation";

(b) In or about December 2018, GFS informed GE that its operation was "transitioning into a bigger facility in Newton, IA that [was] more in line with [its] processing setup in [its] TX facility";

(c) In or about January 2019, GFS provided GE with date- and time-stamped photographs of its Sweetwater, Texas recycling site, purporting to demonstrate its process and capability to recycle the decommissioned Blades;

(d) In or about November 2019, GFS represented to GE that it was making progress on recycling the Blades: "[W]e're making progress with investors and revenues are picking up for us as well. We're continuing to manage the GE blades in an orderly fashion and hope to make significant progress in the breakdown of the blades in 2020"; and

(e) GFS continued to tout on its website that it "offers pioneering fiberglass recycling and green-product manufacturing. [GFS] helps wind energy and other industries avoid landfills, build customer trust, and achieve true sustainability."

73.    GFS made these representations with full knowledge of their falsity. GFS knew that it had made little, if any, progress recycling the Blades, as it was in fact stockpiling them at various locations without further action. GFS's conduct after execution of the Agreements was therefore fraudulent and in bad faith.

74.    GFS's above-described representations were material because the Agreements were premised on—and indeed contemplated—GFS's proper recycling of thousands of Blades within a reasonable amount of time.

75.    Relying on these false representations, GE believed GFS was performing under the Agreements and therefore did not take action to terminate the Agreements or otherwise proceed against GFS.

76.    As a result of GFS's fraud, GE will continue to suffer monetary damage in an amount to be proven at trial, but reasonably believed to be the difference between the cost of standard disposal for the subject Blades and the premium GE paid GFS ($16,900,000), the amounts to be incurred in securing alternative services ($5,500,000), and the harm to reputation that GE has suffered based on these events.

## COUNT IV

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

77.     GE repeats and realleges the allegations of paragraphs 1–76 of its complaint as if fully set forth here.

78.     GFS acted in bad faith prior to, during, and after entering the Agreements based on but not limited to the following:

(a) GFS acted in bad faith by representing after executing the Agreements that it was capable of recycling the Blades when its facilities could not accommodate the volume at issue;

(b) GFS acted in bad faith by failing to notify GE that its facilities were unable to recycle the Blades after the Parties had entered the Agreements;

(c) GFS acted in bad faith by representing that it was making progress on recycling the Blades when it was not in fact doing so; and

(d) GFS acted in bad faith by representing that it has no duty to recycle the Blades under the Agreements.

79.     GFS's acts of bad faith materially breached the Implied Covenant of Good Faith and Fair Dealing in the Agreements including but not limited to the following:

(a) The Implied Covenant of Good Faith and Fair Dealing created a separate and distinct affirmative duty on GFS to negotiate with GE based on GFS's actual capacity to recycle the Blades;

(b) The Implied Covenant of Good Faith and Fair Dealing created a separate and distinct affirmative duty on GFS to notify GE that its facilities were unable to recycle the volume of Blades subject to the Agreements; and

(c) The Implied Covenant of Good Faith and Fair Dealing created a separate and distinct affirmative duty on GFS to truthfully represent the status of recycling the Blades.

80.     As a result of GFS's breach of the implied covenant of good faith and fair dealing, GE will continue to suffer monetary damage in an amount to be proven at trial, but reasonably believed to be the difference between the cost of standard disposal for the subject Blades and the premium GE paid GFS ($16,900,000), the amounts to be incurred in securing alternative services ($5,500,000), and the harm to reputation that GE has suffered based on these events.

## COUNT V

### (Declaratory Judgment on Indemnification)

81.     GE repeats and realleges the allegations of paragraphs 1-80 of its complaint as if fully set forth here.

82.     The Agreements, entered into June 9, 2017, and January 10, 2018, respectively, by and between GE and GFS, were valid and binding contracts.

83.     GE fully performed its obligations under the Agreements, including but not limited to passing title, possession, and control of the Blades to GFS and paying GFS approximately $16,900,000.

84.     However, there exists a real and actual dispute and controversy between GE and GFS concerning GE's rights and GFS's obligations under the Agreements. Accordingly, GE seeks a declaration that GFS must fully defend and indemnify GE from and against all third-party claims and demands arising from the Blades subject to the Agreements, which expressly include the following:

(a)      The Agreements contain an Indemnity Provision at their respective

Sections 12.1, whereby GFS agreed to

> defend, indemnify, release and hold [GE] and its
> Affiliates, and each of its and their directors,
> officers, managers, employees, agents,
> representatives, successors and assigns
> (collectively, the "Indemnitees") harmless from and
> against any and all claims, legal actions, demands,
> settlements, losses, judgments, fines, penalties,
> damages, liabilities, costs and expenses of any
> nature whatsoever, including, all attorneys' fees
> (collectively, "Claims") arising from any act or
> omission of [GFS], its agents, employees or
> subcontractors (collectively, "Supplier Personnel"),
> except to the extent attributable to the sole and
> direct gross negligence of [GE]. . . . [GFS] further
> agrees to indemnify [GE] for any attorneys' fees or
> other cost [GE] incurs to enforce it rights hereunder.

(b)      In its July 2020, correspondence to GE, GFS acknowledged its duty to

indemnify GE, recognizing "that it has the obligations agreed to in

Sections 12.1 and 12.2."

(c)      GE has faced threatened action from third parties arising from the Blades

subject to the Agreements. For instance, on or about December 4, 2020,

Counsel for Phoenix Newton sent a Notice of Intent to Pursue Citizen

Action against GE. In addition, on or about September 26, 2022, the Iowa

AG's Office informed GE that it

> intends to file a civil environmental enforcement
> action against GFS (and a number of GFS-related
> entities), Donald Lilly, Ronald Albrecht, and GE in
> Jasper County District Court to enforce Iowa's solid
> waste laws against GFS, GE, et al., permanently
> enjoin them from future violations, and to seek the
> maximum civil penalty allowed by law.

85.    GE notified GFS of these third-party threatened claims and sought indemnification in letters dated January 20, 2021, and October 21, 2022, respectively. To date, GE has not received a response from GFS and does not expect that one will be forthcoming even though GFS's obligation to indemnify was triggered by GE's receipt of a demand.

86.    Because of GFS's failure to abide by its indemnity obligation, GE has been required to incur both defense costs and costs of settlement, namely costs of procuring substitute performance to remove and actually recycle the Blades. A judicial declaration is necessary and appropriate at this time under the circumstances to prevent and limit further controversies under the Agreements as to the rights and obligations of GE and GFS, respectively.

## CONCLUSION

WHEREFORE, Plaintiff GE requests that judgment be entered in its favor and against Defendant GFS as follows:

1.    Judgment in favor of GE that GFS fraudulently induced GE to enter into the Agreements with the promise that GFS would recycle the Blades;

2.    Judgment in favor of GE that GFS breached the terms of the Agreements when failing to recycle the Blades;

3.    Judgement in favor of GE when GFS committed fraud by consistently reassuring GE that it was recycling the blades;

4.    Judgment in favor of GE that GFS breached the implied covenant of good faith and fair dealing by continually engaging in bad-faith conduct through the parties' business relationship;

5.    Declaratory judgment in favor of GE that, pursuant to the terms of the Agreements, GFS must fully defend and indemnify GE from and against any and all third-party

claims and demands arising from the Blades subject to the Agreements, including as to the claims already brought, for which GE expended significant resources in attorneys' fees and costs and indemnity amounts to secure substitute performance;

6.      Award of damages, which will be determined at trial, but is believed to be the difference between the cost of standard disposal for the subject Blades and the premium GE paid GFS ($16,900,000), the amounts to be incurred in securing alternative services ($5,500,000), and the harm suffered to GE's reputation as a result of the underlying events;

7.      Award to GE its costs of this action, reasonable attorneys' fees (including those incurred as to all third-party demands), and pre- and post-judgment interest pursuant to the Agreements' Indemnity Provision; and

8.      Grant to GE such other and further relief as this Court deems just and proper.

## **<u>JURY DEMAND</u>**

GE demands a trial by jury on all issues triable of right by a jury which are raised for determination.

Dated:  September 20, 2023                    Respectfully submitted,

                                              BAKER & McKENZIE LLP

                                              By:      */s/ Jacob M. Kaplan*
                                                      Jacob M. Kaplan
                                                      State Bar No. JK 0696
                                                      452 Fifth Avenue
                                                      New York, New York 10018
                                                      (212) 626-4100
                                                      jacob.kaplan@bakermckenzie.com

                                                      M. Michelle Hartmann
                                                      New York State Bar No. 4849972
                                                      1900 N. Pearl Street, Suite 1500
                                                      Dallas, Texas 75201
                                                      Telephone: (214) 978-3000
                                                      Facsimile: (214) 978-3099
                                                      michelle.hartmann@bakermckenzie.com

                                                      **COUNSEL FOR DEFENDANT
                                                      GENERAL ELECTRIC COMPANY**