# Exhibit E

## BLADE RECYCLING AGREEMENT

This **BLADE RECYCLING AGREEMENT** (the "**Agreement**") is entered into as of January 10, 2018 (the "**Effective Date**") by and between **General Electric Company**, a corporation organized under the laws of the State of New York, United States of America ("U.S."), acting through its GE Renewable Energy business, with a place of business at 1 River Rd, Schenectady, NY 12345 **("GE"** or **"Buyer")** and **Global Fiberglass Solutions of Texas, LLC** a limited liability company organized under the laws of the State of Texas, U.S., having its principal place of business at 4310 Highway 70, Sweetwater, TX 79556 **("GFS"** or **"Supplier").** Buyer and Seller are referred to herein individually as a "**Party**" and collectively as the "**Parties**".

### RECITALS

**WHEREAS,** Buyer and Supplier desire to enter into this Blade Recycling Agreement as defined herein.

**NOW, THEREFORE,** in consideration of the premises and mutual covenants set forth herein, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

### AGREEMENT

### 1. ENGAGEMENT AND STATEMENT OF WORK

1.1. Buyer engages Supplier to perform services related to the recycling of Buyer's wind turbine blades, which may include the provision of certain deliverables (collectively, the "Services") and which are further described in Buyer's Purchase Order ("PO") and/or Statement of Work ("SOW") documents executed during the Term of this Agreement.

1.2. The SOW shall contain: (i) a detailed description of the Services to be performed, (ii) the documents/data to be provided by Supplier to Buyer. The SOW is incorporated into this agreement as Appendix A.

### 2. PRICING AND SCHEDULE OF FEES

2.1. Supplier shall be paid per the Fee Schedule attached hereto as Appendix B. The foregoing will be the entire compensation to be paid to Supplier and will be in full discharge of any and all liability in contract or otherwise with respect to all Services rendered by the Supplier and Supplier's Personnel.

2.2. Supplier's price for the Services includes all sovereign, state and local sales, use, excise, privilege, payroll and/or occupational taxes, any value added tax that is not recoverable by Buyer and any other taxes, fees, and/or duties applicable to the deliverables, goods and/or Services purchased under this Agreement. If Supplier is obligated by law to charge any value added and/or similar tax to Buyer, Supplier shall ensure that if such value added and/or similar tax is applicable, that it is invoiced to Buyer in accordance with applicable rules so as to allow Buyer to reclaim such value added and/or similar tax from the appropriate government authority. Neither party is responsible for taxes on the other party's income or the income of the other party's personnel or subcontractors. If Buyer is required by government regulation to withhold taxes for which Supplier is responsible, Buyer will deduct such withholding tax from payment to Supplier and provide to Supplier a valid tax receipt in Supplier's name. If Supplier is exempt from such withholding taxes as a result of a tax treaty or other regime, Supplier shall provide to Company a valid tax treaty residency certificate or other tax exemption certificate at a minimum of thirty (30) days prior to payment being due.

2.3. When any applicable governmental law, rule or regulation makes any payment prohibited or improper or requires the payment of a reduced fee, the portion of the fee so affected shall not be paid or if paid shall be refunded to Buyer.

### 3. TERMS AND CONDITIONS

3.1. This Agreement shall be governed in accordance with the terms defined herein, which shall also consist of the GE RENEWABLE ENERGY TERMS OF PURCHASE rev. A. (Revised March 18, 2016), as defined in Appendix C.

4.  **TERM AND TERMINATION**

This Agreement shall be effective when duly signed by both parties and shall expire on December 31, 2019, unless sooner terminated.

5.  **NOTICES**

All notices under this Agreement shall be deemed to have been effectively given when sent electronically or via certified mail return receipt requested, properly addressed to the other party at the address below or at such other address as the party as designated in writing.

| BUYER | SUPPLIER |
|---|---|
| ATTN: | ATTN: |
| Shanon Lutomski | Don Lilly |
| 300 Garlington Rd, Greenville, SC 29615 | 21222 30th Drive SE, Ste. 130, Building C |
| +1 864-254-2554 - phone | Bothell, WA 98021 |
| shanon.lutomski@ge.com | +1 888-717-8882 - phone |
| | donl@globalfiberglasssolutions.com |

6.  **WAIVER, SURVIVAL, ENTIRE AGREEMENT AND EXECUTION IN COUNTERPARTS**

6.1. No claim or right arising out of a breach of this Agreement shall be discharged in whole or part by waiver or renunciation, unless such waiver or renunciation is supported by consideration and is in writing signed by the aggrieved party.  No failure by either party to enforce any rights hereunder shall be construed a waiver.

6.2. All provisions or obligations contained in this Agreement, which by their nature or effect are required or intended to be observed, kept or performed after termination or expiration this Agreement will survive and remain binding upon and for the benefit of the parties, their successors, including without limitation successors by merger, and permitted assigns.

6.3. This Agreement, with such documents as are expressly attached and/or incorporated herein by reference, is intended as a complete, exclusive and final expression of the parties' agreement with respect to such terms as are included, is intended also as a complete and exclusive statement of the terms of their agreement and supersedes any prior or contemporaneous agreements, whether written or oral, between the parties.  There are no representations, understandings or agreements, written or oral that is not included herein.  No course of prior dealings between the parties and no usage of the trade shall be relevant to determine the meaning of this Agreement even though the accepting or acquiescing party has knowledge of the performance and opportunity for objection.  The invalidity, in whole or in part, of any of the foregoing sections or paragraphs of this Agreement shall not affect the remainder of such article or paragraphs or any other sections or paragraphs of this Agreement.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by this respective authorized representatives as of the date first set forth above.

GENERAL ELECTRIC COMPANY, through its
GE Renewable Energy Business

Signed:

Name: Shanon Lutomski

Title: Sr. Commodity Leader

Date: 01/12/2018

Global Fiberglass Solutions of Texas, LLC

Signed:

Name: Don L Lilly

Title: CEO

Date: 1/10/2018

## APPENDIX LIST

| Appendix | Subject |
|----------|---------|
| A | Statement of Work |
| B | Pricing and Schedule of Fees |
| C | GE Renewable Energy Terms of Purchase Rev A |

## APPENDIX A

## STATEMENT OF WORK

### Activity

Supplier shall dispose of the wind turbine blades no later than one (1) week after they have been taken down from the turbine per the schedule provided in Exhibit 1.

Blades shall be disposed of by cutting the blades into moveable pieces (supplier discretion) on the customer site and then moved to an off-site area managed by Supplier. Supplier shall determine final use of blades, however sending the wind turbine blades and or material generated in the recycling process to a landfill is prohibited unless expressly approved by Buyer.

### Technical References

1. 104W2144 - 37m Blade Handling Drawing for reference
2. 115W1562 – 40M Blade Handling Drawing
3. DR-04975/B1 – 42m blade handling drawing
4. Minimum Requirements for cutting blades on-site:
   a. NO dry cutting
   b. Ground protection must be used to capture sludge
   c. Ground protection must be secure, as to not blow away and cause sludge to escape into the environment
   d. A wet-vac to collect any other debris shall be used and supplier shall dispose of contents accordingly
5. Applicable work practice PPE

### Deliverables

1. Weekly summary of actuals to approve invoicing
2. Supplier shall provide full disposal plan including all EHS considerations for approval by GE prior to starting each project.
3. Supplier has provided a general overview of the process and is incorporated for reference in Exhibit 2.

### Schedule Details

Estimated schedule provided in Exhibit 1. Site details including address and contact information to be provided to Supplier two weeks prior to site start.

$\mathcal{SV}$

Exhibit 1

## ESTIMATED SCHEDULE

The schedule defined is only an estimate and is non-binding.



| NAME | STATI | PROJECT | Blade Size | #blades | #WTG's |
|---|---|---|---|---|---|
| NextEra | TX | Cap Ridge IV | 42m | 225 | 75 |
| ENEL | NY | Fenner | 37m | 54 | 18 |
| EDF | MN | Fenton | 40m | 408 | 136 |
| NextEra | NM | New Mexico WEC | 37m | 408 | 136 |
| PEC | IA | Century III | 40m | 30 | 10 |
| MEC | IA | Pomeroy | 42m | 426 | 142 |
| MEC | IA | Pomeroy 3 | 42m | 117 | 39 |
| MEC | IA | Charles City | 42m | 150 | 50 |
| Enel | KA | Smoky Hills II | 42m | 297 | 99 |
| Leeward | TX | Sweetwater 3 | 42m | 267 | 89 |
| AEP | TX | Trent Mesa | 45m | 249 | 83 |
| AEP | TX | Desert Sky | 42m | 258 | 86 |
| NextEra | ND | Langdon | 43m | 237 | 79 |
| NextEra | ND | Langdon Expansion | 42m | 81 | 27 |
| NextEra | OK | Oklahoma WEC | 37m | 204 | 68 |
| NextEra | SD | Hyde County | 37m | 81 | 27 |
| NextEra | ND | Edgeley / Kulm | 37m | 123 | 41 |
| NextEra | ND | Wilton Wind | 42m | 93 | 33 |
| NextEra | OK | Elk City II (non-ESS) | 42m | 144 | 48 |
| NextEra | OK | Elk City II (ESS) | 42m | 54 | 18 |

| NAME | STATI | PROJECT | Blade Size | #blades | #WTG's | | TOTAL |
|---|---|---|---|---|---|---|---|
| NextEra | TX | Cap Ridge IV | 42m | 225 | 75 | | 34 |
| ENEL | NY | Fenner | 37m | 54 | 18 | | 18 |
| EDF | MN | Fenton | 40m | 408 | 136 | | 136 |
| NextEra | NM | New Mexico WEC | 37m | 408 | 136 | | 136 |
| MEC | IA | Century III | 40m | 30 | 10 | | 10 |
| MEC | IA | Pomeroy | 42m | 426 | 142 | | 142 |
| MEC | IA | Pomeroy 3 | 42m | 117 | 39 | | 2 |
| MEC | IA | Charles City | 42m | 150 | 50 | | 50 |
| Enel | KA | Smoky Hills II | 42m | 297 | 99 | | 99 |
| Leeward | TX | Sweetwater 3 | 42m | 267 | 89 | | 6 |
| AEP | TX | Trent Mesa | 45m | 249 | 83 | | 83 |
| AEP | TX | Desert Sky | 42m | 258 | 86 | | 86 |
| NextEra | ND | Langdon | 43m | 237 | 79 | | 75 |
| NextEra | ND | Langdon Expansion | 42m | 81 | 27 | | 27 |
| NextEra | OK | Oklahoma WEC | 37m | 204 | 68 | | 58 |
| NextEra | SD | Hyde County | 37m | 81 | 27 | | 27 |
| NextEra | ND | Edgeley / Kulm | 37m | 123 | 41 | | 41 |
| NextEra | ND | Wilton Wind | 42m | 93 | 33 | | 33 |
| NextEra | OK | Elk City II (non-ESS) | 42m | 144 | 48 | | 48 |
| NextEra | OK | Elk City II (ESS) | 42m | 54 | 18 | | 18 |
| | | TOTAL Turbines | | | | | 1,144 |
| | | Total Blades | | | | | 3,432 |

**Exhibit 2**

**GFSI Wind Blade Recycling Presentation**



# Wind Blade Recycling

Global Fiberglass Solutions, Inc.
Helping to make a change in the world's carbon footprint

# Wind Blade Recycling

Economical • Efficient • Safe • Clean



- ✓ Full EHS compliance and low foot print on the farm
- ✓ Low/no dust and debris process
- ✓ Customer EHS sign off at all work locations/towers
- ✓ Efficient cutting and hauling operation for minimal interference with other work on the wind farm
- ✓ Extensive safety protocol and equipment for workers
- ✓ Nationwide service, years of experience, competitive pricing
- ✓ Daily and weekly reporting on work progress, documenting blades cut/moved and tower pads cleared
- ✓ EPA tie in for recycling credit and recycling certificate listing all blade serial numbers
- ✓ Optional joint PR actions on recycling efforts
- ✓ Option to purchase products made from the blade material at discounted rates

# Loading and transport

After cutting, the wind blade pieces are being loaded onto a truck, in this case a flatbed, and hauled to the nearest GFSI facility for further processing. All safety protocols and DOT regulations are being followed for loading, strapping down the blades and transporting them to the destination.



# Tower pad clean-up and inspection

After completion of blade cutting and hauling, all equipment and debris, if any, will be removed from the tower pad in a final cleanup, followed by a customer inspection and EHS sign-off.



**Global Fiberglass Solutions**

**REMOVAL INSPECTION**
**BLADE RECYCLING**

INSPECTION CHECK POINTS AT THE TOWER PADS
1) All decommissioned blades were removed
2) All pieces of damaged blades, if any, were removed
3) Dust and debris was managed to a minimum (contained and vacuumed)
4) All cutting and loading equipment has been removed
5) The site is in all good or better condition than before the begin of the project

| DATE CUT | COUNT | DATE MOVED | COUNT | TOWER | Project Lead | GFSI Project Lead | |
|----------|-------|------------|-------|-------|--------------|-------------------|---|
| 3/27/17 | 3 | 3/30/17 | 3 | F9-150 | | | |
| 3/27/17 | 3 | 3/30/17 | 3 | F9-145 | | | |
| 3/28/17 | 3 | 3/31/17 | 3 | F9-144 | | | |
| 3/28/17 | 3 | 3/31/17 | 3 | F9-143 | | | |
| 3/28/17 | 3 | 3/31/17 | 3 | F9-142 | | | |
| 3/30/17 | 3 | 4/4/17 | 3 | F8-583 | | | |

# Dust avoidance during cutting



Use of wet saws and/or wire saws with minimal dust generation. The number of cuts at the farm is kept as low as logistically feasible. Any remnants during cutting are being collected in a box underneath the blade.



# Immediate cleanup after cutting



Areas around the box, if any, and inside the blades are being swept and/or vacuumed to avoid any dust during loading and transport.



# Hauling to GFSI laydown yard

The blade section will be hauled from the wind farm to a GFSI laydown yard, where the sections will be further cut and processed into recyclable feedstock.



# From blade sections to bags of feedstock



The first phase of processing includes shredding, bagging, weighing and storage of the material until the final manufacturing specific use of the material has been determined.



# From feedstock to recycled product

The material is further processed into manufacturing grade fibers that can be used for manufacturing a number of recycled products, such as pallets, composite panels and manhole covers.

  

# Cradle-to-cradle tracking

GFSI's tracking system controls the entire recycling process, from cutting the blades to hauling, processing and manufacturing. Customers receive a recycling certificate once all the blades from a project have been used for manufacturing.





APPENDIX B

## PRICING AND SCHEDULE OF FEES

For calendar year 2018 Buyer may place up to EIGHTY PERCENT (80%) of Buyers North America wind turbine blade volume requiring recycling which is estimated to be two thousand, seven hundred and forty five (2,745) blades.

Price per blade for blade recycling: $3,525 each

## APPENDIX C

### GE RENEWABLE ENERGY TERMS OF PURCHASE REV. A – U.S.

1.      **ACCEPTANCE OF TERMS.** Supplier agrees to be bound by and to comply with all terms set forth herein and on the purchase order ("PO") to which these terms are attached or are incorporated by reference (each as amended or supplemented, and together with any specifications and other documents referred to herein or on the PO, collectively, this "Order"). This Order is an offer to purchase the goods and/or services (including any required documentation) described therein. This Order shall not constitute an acceptance of any offer to sell, quotation or other proposal from Supplier, even if referred to in this Order. **Acceptance of this Order is expressly limited to the terms of this Order.** *Buyer hereby notifies Supplier in advance that Buyer objects to any terms and conditions* included with Supplier's quotation, invoice or other document which are additional to or different than the terms of this Order, and none of such additional or different terms shall be part of the contract between Supplier and Buyer, unless specifically accepted by Buyer in writing. This Order shall be irrevocably accepted by Supplier upon the earlier of: (a) Supplier's issuing any acceptance or acknowledgement of this Order; or (b) Supplier's commencement of the work called for by this Order in any manner. The terms set forth in this Order take precedence over any additional or different terms in any other document connected with this transaction unless such additional or different terms are: (a) part of a written agreement ("Agreement"), which has been negotiated between the parties and which the parties have expressly agreed may override these terms in the event of a conflict; or (b) set forth on the PO to which these terms are attached. In the event these terms are part of an Agreement between the parties, the term "Order" used herein shall mean any purchase order issued under the Agreement.

2.      **PRICES, PAYMENTS AND QUANTITIES.**

2.1      *Prices.* All prices are firm and shall not be subject to change. Supplier's price includes all taxes, fees and/or duties applicable to the goods and/or services purchased under this Order; provided, however, that any value added tax that is recoverable by Buyer, state and local sales, use, excise and/or privilege taxes, if applicable, shall not be included in Supplier's price but shall be separately identified on Supplier's invoice. If Supplier is legally obligated to charge value added and/or similar tax, Supplier shall invoice Buyer in accordance with applicable rules to enable Buyer to reclaim such tax. Neither party is responsible for taxes on the other party's income or the income of the other party's personnel or subcontractors. If Buyer is legally required to withhold taxes for which Supplier is responsible, Buyer shall deduct such taxes from payment to Supplier and provide Supplier a valid tax receipt in Supplier's name. If Supplier is exempt from or eligible for a reduced rate of withholding tax, Supplier shall provide to Buyer a valid tax residency certificate or other required documentation at least thirty (30) days prior to payment being due. Supplier warrants the pricing for any goods or services shall not exceed the pricing for the same or comparable goods or services offered by Supplier to third parties. Supplier shall promptly inform Buyer of any lower pricing levels for same or comparable goods or services, and the parties shall promptly make the appropriate price adjustment.

2.2      *Payment Terms.*

(a)    Standard Terms. The ordinary net date ("**Net Date**") shall be one hundred and twenty 120 days after the Payment Start Date. The "**Payment Start Date**" is the latest of the required date identified on this Order, the date of receipt of valid invoice by Buyer or the received date of the goods and/or services in Buyer's receiving system. The received date of the goods and/or services in Buyer's receiving system shall occur: (i) in the case where the goods are shipped directly to Buyer and/or services are performed directly for Buyer, with respect to such goods, within forty-eight (48) hours of Buyer's physical receipt of the goods at its dock and with respect to such services, within forty-eight (48) hours of Supplier's completion of the services; (ii) in the case of goods shipped directly to: (A) Buyer's customer or a location designated by Buyer's customer ("**Material Shipped Direct**" or "**MSD**"); or (B) a non-Buyer/non-customer location to be incorporated into MSD, within forty-eight (48) hours of Supplier presenting Buyer with a valid bill of lading confirming that the goods have been shipped from Supplier's facility; (iii) in the case where goods are shipped directly to or services are performed directly for a third party in accordance with this Order, with respect to such goods, within forty-eight (48) hours of Buyer's receipt of written certification from the third party of its receipt of the goods and with respect to such services, within forty-eight (48) hours of Buyer's receipt of written certification from the third party of Supplier's completion of the services. Unless Buyer initiates payment on an early payment discount date as described in subsection (c) below, Buyer shall initiate payment on the Monthly Batch Payment Date or the Quarterly Batch Payment Date as described in subsection (b) below or on the Net Date.

(b)    Batched Payments. Buyer may choose to group all invoices that have not been discounted and that have Net Dates ranging from the sixteenth day of one month to the fifteenth day of the next month, and initiate payment for all such invoices on the third day of the second month or if that day is not a business day, then on the next business day (each such payment date being referred to as the "**Monthly Batch Payment Date**"), with the result that some invoices shall be paid earlier than their Net Dates and some invoices shall be paid later than their Net Dates. Alternatively, Buyer may choose to group and pay on a quarterly basis all invoices that have not been discounted as follows: (i) invoices with Net Dates ranging from the sixteenth day of February to the fifteenth day of May shall be grouped and Buyer shall initiate payment on the third day of April or if that day is not a business day, then on the next business day; (ii) invoices with Net Dates ranging from the sixteenth day of May to the fifteenth day of August shall be grouped and Buyer shall initiate payment on the third day of July or if that day is not a business day, then on the next business day; (iii) invoices with Net Dates ranging from the sixteenth day of August to the fifteenth day of November shall be grouped and Buyer shall initiate payment on the third day of October or if that day is not a business day, then on the next business day; and (iv) invoices with Net Dates ranging from the sixteenth day of November to the fifteenth day of February shall be grouped and Buyer shall initiate payment on the third day of January or if that day is not a business day, then on the next business day (each such payment date being referred to as the "**Quarterly Batch Payment Date**"), with the result that some invoices shall be paid earlier than their Net Dates and some invoices shall be paid later than their Net Dates.

(c)    Early Payment Discounts. Buyer shall be entitled, either directly or through GEC (defined below) to take an early payment discount of 0.0333% of the gross invoice price (the "**Daily Discount Rate**") for each day payment is initiated before the Net Date. If the Net Date falls on a weekend or holiday, the Net Date shall be moved to the next business day, and Buyer shall take an early payment discount for each day payment is initiated before that date. Alternatively, Buyer may take a flat early payment discount (the "**Flat Discount**") for initiating payment on a date certain prior to the Net Date (the "**Flat Discount Date**"). The Flat Discount shall be calculated

by applying the Daily Discount Rate for each day between the Flat Discount Date and the Net Date. If the Flat Discount Date falls on a weekend or a holiday, Buyer shall initiate payment to Supplier on the next business day and take the Flat Discount. Each early payment discount shall be rounded to the nearest one hundredth of a percent. The Daily Discount Rate is based in part on the 3 Month Libor Rate (defined below) in effect on the last business day of the month preceding the day when the first early payment discount is taken to settle an invoice (the "**Base Libor Rate**"). If the 3 Month Libor Rate in effect on the last business day of any month (the "**Current Libor Rate**") differs from the Base Libor Rate, the Daily Discount Rate may be adjusted on the last business day of such month by 0.00003% for each basis point difference between the Current Libor Rate and the Base Libor Rate on the adjustment date. If the Daily Discount Rate is adjusted, the adjusted Daily Discount Rate shall be applied to all invoices posted for payment after the adjustment date. The "**3 Month Libor Rate**" shall be the three month Libor rate published in the "Money Rates" section of The Wall Street Journal as the "London interbank offered rate, or Libor three month" (or, if not so published, as published in another nationally recognized publication) on the last business day of each month. If Buyer takes an early payment discount to settle an invoice, Supplier confirms that: (i) Buyer has assigned its right, title and interest in the related goods and/or services to GE Capital US Holding, Inc. or another Affiliate (defined in subsection (d)) of the Buyer or a successor entity ("**GEC**") and title to such goods and/or services shall pass directly to GEC in accordance with the terms of this Order; (ii) once title to such goods and/or services has passed to GEC, GEC shall immediately and directly transfer such title to Buyer; and (iii) all of Supplier's obligations under this Order, including Supplier's representations and warranties, shall extend to and benefit Buyer as if title passed directly to Buyer.

(d)  Miscellaneous.  If requested by Buyer, settlement and invoicing shall be paperless and in a format acceptable to Buyer. Supplier's invoice must: (i) bear Buyer's Order number and (ii) be issued only after delivery in accordance with this Order has occurred, but not later than one hundred and twenty (120) days after Buyer's receipt of the goods and/or Supplier's completion of the services. Buyer shall be entitled to reject Supplier's invoice if it fails to include Buyer's Order number, is issued after the time set forth above or is otherwise inaccurate, and any resulting: (i) delay in Buyer's payment; or (ii) nonpayment by Buyer shall be Supplier's responsibility. All goods and/or services provided by Buyer to Supplier for production of the goods and/or services delivered hereunder shall be separately identified on the invoice (i.e., consigned material, tooling, or technology (often referred to as an "Assist" for import/customs purposes)). Each invoice shall also include any reference information for any consigned goods and shall identify any discounts, credits or rebates from the base price used in determining the invoice value. Supplier warrants that it is authorized to receive payment in the currency stated in this Order. No extra charges of any kind shall be allowed. Buyer may withhold total or partial payment until the goods/or services conform to the requirements of this Order. Buyer's payment of an invoice shall not constitute its acceptance of the goods or services. Buyer shall be entitled at any time to set-off any and all amounts owed by Supplier or a Supplier Affiliate (defined below) to Buyer or a Buyer Affiliate (defined below) on this or any other order. "**Affiliate**" shall for the purposes of this Order mean, with respect to either party, any entity, including , any individual, corporation, company, partnership, limited liability company or group, that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with such party.

2.3     Quantities.

(a)  General.  Buyer is not obligated to purchase any quantity of goods and/or services except for such quantity(ies) as may be specified by Buyer either: (i) on the PO; (ii) in a release on the PO; or (iii) on a separate written release issued by Buyer pursuant to this Order. Supplier shall not make material commitments or production arrangements in excess of Buyer's specified quantities and/or in advance of the time necessary to meet Buyer's delivery schedule. Should Supplier do so, any resulting exposure shall be for Supplier's account. Goods delivered to Buyer in excess of the Buyer's specified quantities and/or in advance of schedule may be returned to Supplier at Supplier's risk, and Supplier shall be responsible for all related costs and expenses incurred by Buyer.

(b)  Replacement Parts.  Replacement parts for goods purchased by Buyer are for the purpose of this Section defined as "**Parts**" and are considered "goods" under this Order. Unless specified otherwise by Buyer in writing, Supplier shall provide Parts for a period of twenty (20) years after production of the goods ceases or upon Buyer's consent to an alternative replacement part that provides the same form, fit and function as the Part. Supplier shall continue to supply such Parts past the twenty (20) year period if Buyer orders at least twenty (20) Parts per year during such twenty year period. The prices for any Parts purchased in the first two (2) years of the twenty year period shall not exceed those prices in effect at the time production of the goods ceases, and no set up charges shall be permitted by Supplier or paid by Buyer during this two year period. Thereafter, the prices for Parts shall be negotiated based on Supplier's actual cost of production of such Parts plus any special packaging costs. No minimum order requirements shall apply unless the parties mutually agree in advance. After the end of the twenty (20) year period, Supplier shall continue to maintain in good working condition all Supplier owned tooling required to produce the Parts, and shall not dispose of such tooling without offering Buyer the right of first refusal to purchase such tooling. If Supplier plans to discontinue production of the Parts after the twenty (20) year period, then Supplier shall provide Buyer with one calendar year's notice prior to discontinuing such Parts.

3.      **DELIVERY AND TITLE PASSAGE.**

3.1  Delivery.  Time is of the essence of this Order. If Supplier delivers the goods or completes the services later than scheduled, Buyer may assess such amounts as may be set forth on the PO or in this Order as liquidated damages for the time period between the scheduled delivery date and the actual delivery date (the  "**Delay Period**" ). The parties agree that if liquidated damages are set forth on the PO or in this Order, they are the exclusive remedy for the damages resulting from the Delay Period only; are a reasonable pre-estimate of such damages Buyer shall suffer as a result of delay based on circumstances existing at the time this Order was issued; and are to be assessed as liquidated damages and not as a penalty. Buyer's resort to liquidated damages for the Delay Period does not preclude Buyer's right to other remedies, damages and choices under this Order other than the damages resulting from the Delay Period, including, but not limited to Buyer's right to terminate this Order for non delivery. If no liquidated damages are set forth on the PO or in this Order, Buyer shall be entitled to recover all damages it incurs as a result of Supplier's failure to perform as scheduled. All delivery designations are Incoterms® 2010. Unless otherwise set forth on the PO, all goods provided under this Order shall be delivered FCA Supplier's facility except goods that are to be shipped directly to Buyer's customer or a location designated by Buyer's customer that are: (a) not to be exported; or (b) exported from the United States of America ("**U.S.**"), shall be delivered EXW Supplier's facility. The term EXW used herein is modified from the Incoterms® 2010 definition to mean "EXW with Supplier responsible for loading the goods at Supplier's risk

and expense". Buyer may specify contract of carriage in all cases. Failure of Supplier to comply with any such Buyer specification shall cause all resulting transportation charges to be for the account of Supplier.

3.2 *Title* .Unless otherwise stated on the PO or in this Order: (a) title to goods shipped from the U.S. for delivery to all locations shall pass at: (i) Supplier's dock for goods shipped directly to a non-Buyer's facility; (ii) port of import for goods shipped to Buyer's non-U.S. facility; and (iii) Buyer's dock for goods shipped to Buyer's U.S. facility; (b) title to goods shipped from one country in the European Union ("EU") for delivery to another country within the EU, shall pass: (i) when the goods leave the territorial land, air or sea space of the EU source country for goods shipped directly to a non-Buyer's EU facility; and (ii) at Buyer's dock for goods shipped to Buyer's EU facility; (c) title to goods shipped from the source country for delivery within the source country (excluding shipments within the U.S., which are governed by subsection (a) above) shall pass at: (i) Supplier's dock for goods shipped directly to a non-Buyer's facility; and (ii) Buyer's dock for goods shipped to Buyer's facility; (d) title to goods shipped from outside the U.S. for delivery to a different country outside the U.S. (excluding shipments within the EU, which are governed by subsection (b) above) shall pass at: (i) the port of export after customs clearance for goods shipped directly to a non-Buyer's facility; and (ii) port of import if shipped to Buyer's facility; and (e) title to goods shipped from outside the U.S. for delivery within the U.S. shall pass at: (i) the port of export after customs clearance for goods shipped directly to a non-Buyer's facility; and (ii) Buyer's dock if shipped to Buyer's facility. For this purpose, Buyer and Supplier acknowledge that the territorial seas of the U.S. extend to twelve (12) nautical miles from the baseline of the country determined in accordance with the 1982 United Nations Convention of the Law of the Sea.

**4.** **BUYER'S PROPERTY.** All tangible and intangible property, including information or data of any description, tools, materials, drawings, computer software, know-how, documents, trademarks, copyrights, equipment or material: (a) furnished to Supplier by Buyer; (b) specifically paid for by Buyer; or (c) created with Buyer's IP Rights (defined in Section 5 below) shall be and remain Buyer's personal property (collectively, **"Buyer's Property"**). Such Buyer's Property furnished by Buyer to Supplier shall be accepted by Supplier *"AS IS"* with all faults and without any warranty whatsoever, express or implied, shall be used by Supplier at its own risk, and shall be subject to removal at Buyer's written request. Supplier shall not substitute any other property for Buyer's Property. Promptly upon receipt of a removal request from Buyer, Supplier shall prepare such Buyer's Property for shipment and deliver it to Buyer at Supplier's expense in the same condition as originally received by Supplier, reasonable wear and tear excepted. Prior to using Buyer's Property, Supplier shall inspect it and train its personnel and other authorized users in its safe and proper operation. In addition, Supplier shall: (i) keep Buyer's Property free of encumbrances and insured at its expense at an amount equal to the replacement cost thereof with loss payable to Buyer; (ii) plainly mark or otherwise adequately identify it as owned by Buyer; (iii) unless otherwise agreed to by Buyer in writing, store it separate and apart from Supplier's and third party owned property under Supplier's control; (iv) maintain it properly, and in compliance with any handling and storage requirements provided by Buyer, or that accompanied it when delivered to Supplier; (v) supervise its use; and (vi) use it only to meet Buyer's Orders without disclosing or otherwise reproducing it for any other purpose.

**5.** **INTELLECTUAL PROPERTY.**

5.1     *General.* Buyer hereby grants a non-exclusive, non-assignable license, which is revocable with or without cause at any time, to Supplier to use any information, drawings, specifications, computer software, know-how and other data furnished or paid for by Buyer hereunder for the sole purpose of performing this Order for Buyer. Seller hereby grants a non-exclusive, non-assignable license, which is revocable with or without cause at any time, to Buyer to use any information and other data furnished or paid for by Seller hereunder for the sole purpose of performing in accordance with the Agreement. The parties agree that each party exclusively owns all intellectual property it had prior to the commencement of this Order.

5.2     *Embedded Software.* To the extent any goods contain Embedded Software (defined below) that is not Buyer's Property, no title to such Embedded Software shall pass to Buyer, and Supplier shall grant Buyer, its customers and all other users a non-exclusive worldwide, irrevocable, perpetual, royalty-free right to use, load, install, execute, demonstrate, market, test, resell, sublicense and distribute such Embedded Software as an integral part of such goods or for servicing the goods (the **"Buyer-Required License"**). If such Embedded Software or any part thereof is owned by a third party, prior to delivery, Supplier shall obtain the Buyer-Required License from such third party owner. **"Embedded Software"** means software necessary for operation of goods and embedded in and delivered as an integral part of goods.

**6.** **CHANGES.**

6.1     *Buyer Changes.* Buyer may at any time make changes within the scope of this Order in any one or more of the following: (a) drawings, designs or specifications; (b) method of shipment or packing; (c) place and time of delivery; (d) amount of Buyer's furnished property; (e) quality; (f) quantity; or (g) scope or schedule of goods and/or services. Supplier shall not proceed to implement any change until such change is provided in writing by Buyer. If any changes cause an increase or decrease in the cost or schedule of any work under this Order, an equitable adjustment shall be made in writing to the Order price and/or delivery schedule as applicable. Any Supplier claim for such adjustment shall be deemed waived unless asserted within thirty (30) days from Supplier's receipt of the change or suspension notification and may only include reasonable, direct costs that shall necessarily be incurred as a direct result of the change.

6.2     *Supplier Changes.* Supplier shall notify Buyer in writing in advance of any and all: (a) changes to the goods and/or services, their specifications and/or composition; (b) process changes; (c) plant and/or equipment/tooling changes or moves; (d) transfer of any work hereunder to another site; and/or (e) sub-supplier changes, and no such change shall occur until Buyer has approved such change in writing. Supplier shall be responsible for obtaining, completing and submitting proper documentation regarding any and all changes, including complying with any written change procedures issued by Buyer.

**7.** **INSPECTION/TESTING AND QUALITY.**

7.1     *Inspection/Testing.* In order to assess Supplier's work quality and/or compliance with this Order, upon reasonable notice by Buyer all: (a) goods, materials and services related to the items purchased hereunder, including, raw materials, components, assemblies, work in process, tools and end products shall be subject to inspection and test by Buyer, its customer, representative or regulatory authorities at all places, including sites where the goods are made or located or the services are performed, whether at Supplier's premises or elsewhere; and (b) of Supplier's facilities, books and records relating to this Order shall be subject to inspection by Buyer or its designee. If specific Buyer and/or Buyer's customer tests, inspection and/or witness points are included in this Order, the goods shall

not be shipped without an inspector's release or a written waiver of test/inspection/witness with respect to each such point; however, Buyer shall not be permitted to unreasonably delay shipment; and Supplier shall notify Buyer in writing at least twenty (20) days prior to each of Supplier's scheduled final and, if applicable, intermediate test/inspection/witness points. Supplier agrees to cooperate with such/audit inspection including, completing and returning questionnaires and making available its knowledgeable representatives. Buyer's failure to inspect or reject or detect defects by inspection shall not relieve Supplier from its responsibilities under this Order. Supplier agrees to provide small business as well as minority and/or women owned business utilization and demographic data upon request.

7.2     *Quality.* When requested by Buyer, Supplier shall promptly submit real-time production and process data ("**Quality Data**") in the form and manner requested by Buyer. Supplier shall provide and maintain an inspection, testing and process control system ("**Supplier's Quality System**") covering the goods and services provided hereunder that is acceptable to Buyer and its customer and complies with Buyer's quality policy, quality requirements in this Order and/or other quality requirements that are otherwise agreed to in writing by the parties ("**Quality Requirements**"). Acceptance of Supplier's Quality System by Buyer does not alter Supplier's obligations and/or liability under this Order, including, Supplier's obligations regarding its sub- suppliers and subcontractors. If Supplier's Quality System fails to comply with the terms of this Order, Buyer may require additional quality assurance measures at Supplier's expense necessary to meet Buyer's Quality Requirements. Supplier shall keep complete records relating to Supplier's Quality System, including all testing and inspection data and shall make such records available to Buyer and its customer for the longer of: (a) three (3) years after completion of this Order; (b) such period as set forth in the specifications applicable to this Order; or (c) such period as required by applicable Law. If Supplier is not the manufacturer of the goods, Supplier shall certify the traceability of the goods to the original equipment manufacturer on the certificate of conformance. If Supplier cannot certify traceability of the goods, Supplier shall not ship such goods to Buyer without obtaining Buyer's written consent. Any review or approval of drawings by Buyer shall be for Supplier's convenience and shall not relieve Supplier of its responsibility to meet all requirements of this Order.

7.3     *Product Recall.*

(a)  If a recall is required by applicable Law, or Buyer or Supplier reasonably determines that a recall is advisable based on the fact that that the goods create a potential safety hazard, the parties shall promptly communicate such facts to each other. At Buyer's request, Supplier shall promptly develop a corrective action plan, which shall include all actions required to recall and/or repair the goods and any actions required by applicable Law ("**Corrective Action Plan**") for Buyer's review and approval. At Buyer's election, Buyer may develop the Corrective Action Plan. Supplier and Buyer agree to cooperate and work together to ensure that the Corrective Action Plan is acceptable to both parties. In no event shall Buyer and Supplier's failure to agree on the Corrective Action Plan delay the timely notification of a potential safety hazard to users of the goods or cause either party to be non-compliant with applicable Law. Supplier and Buyer shall cooperate with and assist each other in any corrective actions and/or filings.

(b)  To the extent a recall is determined to have been caused by a defect, non-conformance or non-compliance, which is the responsibility of Supplier, Supplier shall hold harmless Buyer from all reasonable costs and expenses incurred in connection with any recall, repair, replacement or refund program, including all costs related to: (i) investigating and/or inspecting the affected goods; (ii) notifying Buyer's customers; (iii) repairing, or where repair of the goods is impracticable or impossible, repurchasing or replacing the recalled goods; (iv) packing and shipping the recalled goods; and (v) media notification. Each party shall consult the other before making any statements to the public or a governmental agency relating to such recall or potential safety hazards, except where such consultation would prevent timely notification required by Law.

8.     **REJECTION.** If any of the goods and/or services furnished pursuant to this Order are found within a reasonable time after delivery to be defective or otherwise not in conformity with the requirements of this Order, then Buyer, at its option may: (a) require Supplier, at its expense, to immediately re perform any defective portion of the services and/or require Supplier to immediately repair or replace non- conforming goods with goods that conform to all requirements of this Order; (b) take such actions as may be required to cure all defects and/or bring the goods and/or services into conformity with all requirements of this Order, in which event all related costs and expenses shall be for Supplier's account; (c) reject and/or return at Supplier's risk and expense all or any portion of such goods and/or services; and/or (d) rescind this Order without liability.  For any repairs or replacements, Supplier, at its cost and expense, shall perform any tests requested by Buyer to verify conformance to this Order.

9.     **WARRANTIES.**

9.1     Supplier warrants that all goods and services provided pursuant to this Order shall be: (a) free of all claims, liens, or encumbrances (other than liens arising through Buyer); (b) new and of merchantable quality, not used, rebuilt or made of refurbished material unless approved in writing by Buyer; (c) free from all defects in design, workmanship and material; (d) fit for the particular purpose for which they are intended; and (e) provided in strict accordance with all specifications, samples, drawings, designs, descriptions or other requirements approved or adopted by Buyer. Supplier further warrants that it shall perform the services and work hereunder in a competent, safe, and professional manner in accordance with the highest standards and best practices of Supplier's industry.

9.2     The warranties set forth in Section 9.1 above, shall extend to the future performance of the goods and services and apply for a period of: (a) (i) in the case of non- nuclear power related goods and services twenty-four (24) months from the Date of Commercial Operation (defined below) of the power plant or (ii) in the case of nuclear power-related goods and services, thirty-six (36) months from the Date of Commercial Operation of the nuclear power plant, where the goods and services are meant to be used or (b) forty-eight (48) months, plus delays such as those due to non-conforming goods and services, from the date of delivery of the goods or performance of the services, whichever period expires first. "**Date of Commercial Operation**" means the date on which the (nuclear or non-nuclear) power plant has successfully passed all performance and operational tests required by the end customer for commercial operation. In all other cases the warranty shall apply for twenty-four (24) months from delivery of the goods or performance of the services, or such longer period of time as customarily provided by Supplier, plus delays such as those due to non-conforming goods and services. The warranties shall apply to Buyer, its successors, assigns and the users of goods and services covered by this Order.

SV

9.3     If any of the goods and/or services are found to be defective or otherwise not in conformity with the warranties in this Section during the warranty period, Buyer, at its option may: (a) require that Supplier, at its expense, inspect, remove, reinstall, ship and repair or replace/re-perform nonconforming goods and/or services with goods and/or services that conform to this Order; (b) take such actions as may be required to cure all defects and/or bring the goods and/or services into conformity with this Order, in which event all related costs and expenses shall be for Supplier's account; and/or (c) reject and/or return at Supplier's risk and expense all or any portion of such goods and/or services. Any repaired or replaced good, or part thereof, or re-performed services shall carry warranties on the same terms as set forth above, with the warranty period being the greater of the original unexpired warranty or twenty-four (24) months after repair or replacement. For any repairs or replacements, Supplier, at its cost and expense, shall perform any tests requested by Buyer to verify conformance to this Order.

10.     SUSPENSION.  Buyer may at any time, by notice to Supplier, suspend performance of the work for such time as it deems appropriate. Upon receiving notice of suspension, Supplier shall promptly suspend work to the extent specified, properly caring for and protecting all work in progress and materials, supplies and equipment Supplier has on hand for performance. Upon Buyer's request, Supplier shall promptly deliver to Buyer copies of outstanding purchase orders and subcontracts for materials, equipment and/or services for the work and take such action relative to such purchase orders and subcontracts as Buyer may direct. Buyer may at any time withdraw the suspension as to all or part of the suspended work by written notice specifying the effective date and scope of withdrawal. Supplier shall resume diligent performance on the specified effective date of withdrawal. All claims for increase or decrease in the cost of or the time required for the performance of any work caused by suspension shall be pursued pursuant to, and consistent with, Section 6.1.

11.     TERMINATION.

11.1    *Termination for Convenience.* Buyer may terminate all or part of this Order for convenience at any time by written notice to Supplier. Upon such termination, Buyer and Supplier shall negotiate reasonable termination costs., which shall be no less than SEVEN HUNDRED SIXTY NINE THOUSAND US DOLLARS ($ 769,000). Any Supplier claim for such costs shall include reasonable documentation supporting such claim and shall be deemed waived unless asserted within thirty (30) days from Supplier's receipt of the Buyer's termination notice.

11.2    *Termination for Default.* Except for delay due to causes beyond the control and without the fault or negligence of Supplier (lasting not more than sixty (60) days), Buyer, without liability, may by written notice of default, terminate all or part of this Order if Supplier fails to comply with any term of this Order or fails to make progress which, in Buyer's reasonable judgment, endangers performance of this Order. Such termination shall become effective if Supplier does not cure such failure within ten (10) days of receiving Buyer's written notice of default; except that Buyer's termination for Supplier's breach of Sections 14, 15 or 16 shall become effective immediately upon Supplier's receipt of Buyer's written notice of default. Upon termination, Buyer may procure goods and/or services similar to those so terminated, and Supplier shall be liable to Buyer for any excess costs for such goods and/or services and other related costs. Supplier shall continue performance of this Order to the extent not terminated by Buyer. If Supplier for any reason anticipates difficulty in complying with any requirements of this Order, Supplier shall promptly notify Buyer in writing. Without limiting any other rights herein, if Buyer agrees to accept deliveries after the delivery date has passed, Buyer may require delivery by the fastest method and the total cost of such shipment and handling shall be borne by Supplier.

11.3    *Termination for Insolvency.* If (a) Supplier dissolves or ceases to do business; (b) Supplier fails to pay its debts as they come due; or (c) Supplier or any other entity institutes insolvency, receivership, bankruptcy or any other proceeding for settlement of Supplier's debts, Buyer may immediately terminate this Order without liability, except for goods or services completed, delivered and accepted within a reasonable period after termination (which shall be paid for at the Order price).

11.4    *Supplier's Obligations on Termination.* Unless otherwise specified by Buyer, upon Supplier's receipt of a notice of termination of this Order, Supplier shall promptly: (a) stop work as directed in the notice; (b) place no further subcontracts/orders related to the terminated portion of this Order; (c) terminate, or if requested by Buyer assign, all subcontracts/orders to the extent they relate to work terminated; and (d) deliver all completed work, work in process, designs, drawings, specifications, documentation and material required and/or produced in connection with such work.

12.     INDEMNITY AND INSURANCE.

12.1    *Indemnity.* Supplier shall defend, indemnify, release and hold Buyer and its Affiliates, and each of its and their directors, officers, managers, employees, agents, representatives, successors and assigns (collectively, the "**Indemnitees**") harmless from and against any and all claims, legal actions, demands, settlements, losses, judgments, fines, penalties, damages, liabilities, costs and expenses of any nature whatsoever, including, all attorneys' fees (collectively, "Claims") arising from any act or omission of Supplier, its agents, employees or subcontractors ( collectively, "**Supplier Personnel**"), except to the extent attributable to the sole and direct gross negligence of Buyer. Supplier agrees to include a clause substantially similar to the preceding clause in all subcontracts it enters into related to its fulfillment of this Order. In addition, Supplier shall indemnify, defend, release and hold the Indemnitees harmless from and against any Claims arising out of employment or labor claims or proceedings initiated by Supplier Personnel against or involving Buyer. Supplier further agrees to indemnify Buyer for any attorneys' fees or other cost Buyer incurs to enforce it rights hereunder.

12.2    *Insurance.* For the duration of this Order and for a period of six (6) years from the date of delivery of the goods or performance of the services, Supplier shall maintain, through insurers with a minimum A.M. Best rating of A- VII or S&P A or the equivalent in those jurisdictions that do not recognize such rating classification and licensed in the jurisdiction where goods are sold and/or where services are performed, the following insurance: (a) Commercial General/Public Liability, on an occurrence form, in the minimum amount of USD $5,000,000.00 per occurrence with coverage for: (i) bodily injury/property damage; (ii) personal/advertising injury; and (iii) products/completed operations liability, including coverage for contractual liability insuring the liabilities assumed in this Order, with all such coverages in this Section 12.2(a) applying on a primary basis, providing for cross liability, not being subject to any self-insured retention and being endorsed to name General Electric Company, its Affiliates (defined in Section 2.2(d)), directors, officers, agents and employees as additional insureds; (b) Business Automobile Liability Insurance covering all owned, hired and non-owned vehicles used in the performance of this Order in the amount of USD $2,000,000.00 combined single limit each occurrence; (c) Employers' Liability in the amount of USD $2,000,000.00 each accident, injury or disease; (d) Property Insurance on an "All-risk" basis covering the full replacement

cost value of all of Buyer's Property in Supplier's care, custody or control, with such policy being endorsed to name Buyer as "Loss Payee" as its interests may appear; and (e) appropriate Workers' Compensation Insurance protecting Supplier from all claims under any applicable Workers' Compensation or Occupational Disease Act. Supplier shall obtain coverage similar to Workers' Compensation and Employers' Liability for each Supplier employee performing work under this Order outside of the U.S. To the extent that this Order is for professional services, Supplier shall maintain Professional/ Errors and Omission Liability insurance in the minimum amount of $5,000,000.00 per claim. If any insurance is on a claims-made basis, the retro date must precede the date of issuance of this Order and Supplier must maintain continuity of coverage for three (3) years following termination, expiration and/or completion of this Order. Insurance specified in sub-sections 12.2(c), (d) and (e) shall be endorsed to provide a waiver of subrogation in favor of Buyer, its Affiliates (defined in section 2.2(d)) and its and their respective employees for all losses and damages covered by the insurances required in such subsections. The application and payment of any self-insured retention or deductible on any policy carried by Supplier shall be the sole responsibility of Supplier. Should Buyer be called upon to satisfy any self-insured retention or deductible under Supplier's policies, Buyer may seek indemnification or reimbursement from Supplier where allowed by Law. Upon request by Buyer, Supplier shall provide Buyer with a certificate(s) of insurance evidencing that the required minimum insurance is in effect. The certificate(s) of insurance shall reference that the required coverage extensions are included on the required policies. Upon request by Buyer, copies of endorsements evidencing the required additional insured status, waiver of subrogation provision and/or loss payee status shall be attached to the certificate(s) of insurance. Acceptance of such certificate(s), which are not compliant with the stipulated coverages, shall in no way whatsoever imply that Buyer has waived its insurance requirements or any other obligations set forth herein. The above-referenced insurance limits in subsections (a), (b) and (c) can be met either via each policy or via a combination of these policies and an excess/umbrella liability insurance policy.

13.   **ASSIGNMENT, SUBCONTRACTING AND CHANGE OF CONTROL.** Supplier may not assign, delegate, subcontract, or transfer (including by change of ownership or control, by operation of law or otherwise) this Order or any of its rights or obligations hereunder, including payment, without Buyer's prior written consent. Should Buyer grant consent to Supplier's assignment, Supplier shall ensure that such assignee shall be bound by the terms and conditions of this Order. Further, Supplier shall advise Buyer of any subcontractor or supplier to Supplier: (a) that shall have at its facility any parts, components, or goods with Buyer's or any of its Affiliates' name, logo or trademark (or that shall be responsible to affix the same); and/or (b) fifty percent (50%) or more of whose output from a specific location is purchased directly or indirectly by Buyer. In addition, Supplier shall obtain for Buyer, unless advised to the contrary in writing, written acknowledgement by such assignee, subcontractor and/or supplier to Supplier of its commitment to act in a manner consistent with Buyer's integrity policies, and to submit to, from time to time, on-site inspections or audits by Buyer or Buyer's third party designee as requested by Buyer. Subject to the foregoing, this Order shall be binding upon and inure to the benefit of the parties, their respective successors and assigns.

14.   **COMPLIANCE WITH GE POLICIES.** Supplier acknowledges that it has read and understands the *GE Integrity Guide for Suppliers, Contractors and Consultants*, which may be updated or modified by Buyer from time to time (the "**Guide**"), and which is located at: http://www.gesupplier.com/html/SuppliersIntegrityGuide.htm. Supplier agrees to fully comply with the Guide with regard to provision of the goods and/or services. Supplier agrees not to pay, promise to pay, give or authorize the payment of any money or anything of value, directly or indirectly, to any person for the purpose of illegally or improperly inducing a decision or obtaining or retaining business in connection with this Order.

15.   **COMPLIANCE WITH LAWS.**

15.1   *General.* Supplier represents, warrants, certifies and covenants ("**Covenants**") that it shall comply with all laws, treaties, conventions, protocols, regulations, ordinances, codes, standards, directives, orders and rules issued by governmental agencies or authorities which are applicable to the activities relating to this Order (collectively, "**Laws(s)**") and the Guide.

15.2   *Environment, Health and Safety.*

(a) <u>General.</u> Supplier Covenants that it shall take appropriate actions necessary to protect health, safety and the environment and has established effective requirements to ensure any suppliers it uses to perform the work called for under this Order shall be in compliance with Section 15 of this Order.

(b) <u>Material Content and Labeling.</u> Supplier Covenants that each chemical substance or hazardous material constituting or contained in the goods is suitable for use and transport and is properly packaged, marked, labeled, documented shipped and/or registered under applicable Law. Notwithstanding the foregoing, Supplier Covenants that none of the goods contains any of the following: (i) arsenic, asbestos, benzene, beryllium, carbon tetrachloride, cyanide, lead or lead compounds, cadmium or cadmium compounds, hexavalent chromium, mercury or mercury compounds, trichloroethylene, tetrachloroethylene, methyl chloroform, polychlorinated biphenyls ("PCBs"), polybrominated biphenyls ("PBBs"), polybrominated diphenyl ethers ("PBDEs"), nanoscale materials; or (ii) any chemicals that are restricted or otherwise banned under the Montreal Protocol, the Stockholm Convention on Persistent Organic Pollutants, the US Toxic Substances Control Act, the European Union's Restrictions on Hazardous Substances and REACH legislation, and other comparable chemical regulations unless, Buyer expressly agrees in writing. Upon request from Buyer, Supplier shall provide Buyer with safety data sheets, the chemical composition, including proportions, of any substance, preparation, mixture, alloy or goods supplied under this Order and any other relevant information or data. Hazardous materials as used in this Order means any substance or material regulated on the basis of potential impact to safety, health or the environment pursuant to applicable Law.

15.3   *Subcontractor Flow-downs for U.S. Government Commercial Items Contracts.* Where the goods and/or services being procured by Buyer from Supplier are in support of a U.S. Government end customer or an end customer funded in whole or part by the U.S. Government, the following additional terms in the "GE Power & Water Government Acquisition of Commercial Items Appendix" which are available at http://www.gesupplier.com/html/GEPolicies/download/US_Government_Flowdown_Provisions_(120415).pdf shall apply to this Order. Supplier acknowledges it has reviewed such appendix and agrees to comply with such terms if applicable and Covenants that it has not been declared ineligible to contract with the U.S. Government or an end customer funded in whole or part by the U.S. Government.

15.4    *Import & Export Compliance.*

(a)    General. Supplier Covenants that it is knowledgeable regarding all applicable export, export control, customs and import laws and shall comply with such laws and any instructions and/or policies provided by Buyer. This shall include securing all necessary clearance requirements, export and import licenses and exemptions from such licenses, and making all proper customs declarations and filings with and notifications to appropriate governmental bodies, including disclosures relating to the provision of services and the release or transfer of goods, hardware, software and technology to foreign destinations or nationals. Supplier Covenants that it shall not cause or permit any goods, technical data, software or the direct product thereof furnished by Buyer in connection with this Order to be exported, transshipped, re-exported or otherwise transferred except where expressly permitted by Law. Supplier Covenants that it is not suspended, debarred or declared ineligible to export by any government entity. In the event that Supplier is suspended, debarred or declared ineligible by any government entity, Buyer may terminate this Order immediately without liability to Buyer.

(b)    Trade Restrictions.

(i)    Supplier Covenants that it shall not sell, distribute, disclose, release, receive or otherwise transfer any item or technical data provided under this Order to or from: (1) any country designated as a "State Sponsor of Terrorism" or "SST" by the U.S. Department of State, (2) any entity located in, or owned by an entity located in a SST country, or (3) any person or entity listed on the "Specifically Designated Nationals and Blocked Persons" list maintained by the U.S. Department of Treasury. This clause shall apply regardless of the legality of such a transaction under local law.

(ii)    Buyer may, from time to time and for business reasons, withdraw from and/or restrict its business dealings in certain jurisdictions, regions, territories and/or countries. Thus, subject to applicable Law, Supplier hereby agrees not to supply any goods to Buyer under this Order that are sourced directly or indirectly from any such jurisdiction, region, territory and/or country identified to Supplier by Buyer, which currently includes, Cuba, North Korea and the disputed region of Crimea.

(c)    Trade Remedy Laws. Supplier Covenants that no goods sold to Buyer hereunder are subject to antidumping or countervailing duties. Supplier Covenants that all sales made hereunder shall be made in circumstances that shall not give rise to the imposition of new antidumping or countervailing duties or other duties or tariffs including, in connection with a trade dispute or as a remedy in an "escape clause", under the Law of any countries to which the goods may be exported. In the event that any jurisdiction imposes such duties or tariffs on goods subject to this Order, Buyer may terminate this Order immediately upon written notice to Supplier without liability to Buyer.

(d)    Shipping/Documentation Requirements. With each shipment, Supplier shall provide: (i) a packing list containing all information specified in Section 19 below, (ii) a commercial or pro forma invoice and (iii) all required security-related information needed for the import of the goods. The commercial/pro forma invoice shall include: contact names and telephone numbers of representatives of Buyer and Supplier who have knowledge of the transaction; Buyer's order number; order line item; part number; release number (in the case of a "blanket order"); detailed description of the merchandise; quantity; unit purchase price in the currency of the transaction; Incoterms® 2010 used in the transaction; the named place of delivery; and both (1) "country of origin" of the goods and (2) customs tariff numbers of the country of consignment, as each are determined under customs Law; the applicable national export control numbers; and if the goods are subject to U.S. export regulations, ECCN or ITAR classifications.

(e)    Preferential Trade Agreements/Duty Drawback. If goods shall be delivered to a destination country having a trade preferential or customs union agreement ("**Trade Agreement**") with Supplier's country, Supplier shall cooperate with Buyer to review the eligibility of the goods for any special program for Buyer's benefit and provide Buyer with any required documentation, including declarations or certificates of origin to support the applicable special customs program or Trade Agreement to allow duty free or reduced duty for entry of goods into the destination country. If Supplier is the importer of record for any goods purchased hereunder, including any component parts thereof, upon Buyer's request, Supplier shall provide Buyer with all necessary customs documentation to enable Buyer to file for and obtain duty drawback. Supplier shall promptly notify Buyer of any known documentation errors and/or changes to the origin of goods. Supplier shall indemnify Buyer for any costs, fines, penalties or charges arising from Supplier's inaccurate documentation or untimely cooperation.

16.    CONFIDENTIALITY, DATA PROTECTION AND PUBLICITY.

16.1    *Confidentiality.*

(a)    "**Confidential Information**" for purposes of this Order shall mean: (i) the terms of this Order; (ii) all information and material disclosed or provided by Buyer to Supplier, including Buyer's Property; (iii) all information Supplier Personnel derive from Buyer's Property; and (iv) all of Buyer's IP Rights (defined in Section 5).

(b)    Supplier shall: (i) use the Confidential Information only for the purposes of fulfilling Supplier's obligations under this Order; and (ii) without limiting the requirements under Section 16.2, use the same degree of care with the Confidential Information as with its own confidential information, which shall be at least a reasonable standard of care, to prevent disclosure of the Confidential Information, except to its officers, directors, managers, and employees (collectively, "**Authorized Parties**"), solely to the extent necessary to permit them to assist the Supplier in performing its obligations under this Order. Supplier agrees that prior to disclosing the Confidential Information to any Authorized Party, Supplier shall advise the Authorized Party of the confidential nature of the Confidential Information and ensure that such party has signed a confidentiality agreement no less restrictive than the terms of this Section. Supplier acknowledges the irreparable harm that shall result to the Buyer if the Confidential Information is used or disclosed contrary to the provisions of this Section.

(c)    The restrictions in this Section 16 regarding the Confidential Information shall be inoperative as to particular portions of the Confidential Information disclosed by Buyer to Supplier if such information: (i) is or becomes generally available to the public other than as a result of disclosure by Supplier; (ii) was available on a non-confidential basis prior to its disclosure to Supplier; (iii) is or becomes available to Supplier on a non-confidential basis from a source other than Buyer when such source is not, to the best of Supplier's

knowledge, subject to a confidentiality obligation with Buyer; or (iv) was independently developed by Supplier, without reference to the Confidential Information, and Supplier can verify the development of such information by written documentation.

(d) Within thirty (30) days of the completion or termination of this Order, Supplier shall return to Buyer or destroy (with such destruction certified in writing to Buyer) all Confidential Information, including any copies thereof. No such return or destruction of the Confidential Information shall affect the confidentiality obligations of Supplier all of which shall continue in effect as provided for in this Order.

(e) Any knowledge or information, which Supplier shall have disclosed or may hereafter disclose to Buyer and which in any way relates to the goods or services purchased under this Order (except to the extent deemed to be Buyer's Property as set forth in Section 4), shall not be deemed to be confidential or proprietary and shall be acquired by Buyer free from any restrictions (other than a claim for infringement) as part of the consideration for this Order, and notwithstanding any copyright or other notice thereon, Buyer shall have the right to use, copy, modify and disclose the same as it sees fit.

(f) Notwithstanding the foregoing, if Supplier is requested or required by interrogatories, subpoena or similar legal process, to disclose any Confidential Information, it agrees to provide Buyer with prompt written notice of each such request/requirement, to the extent practicable, so that Buyer may seek an appropriate protective order, waive compliance by Supplier with the provisions of this Section, or both. If, absent the entry of a protective order or receipt of a waiver, Supplier is, in the opinion of its counsel, legally compelled to disclose such Confidential Information, Supplier may disclose such Confidential Information to the persons and to the extent required without liability under this Order and shall use its best efforts to obtain confidential treatment for any Confidential Information so disclosed.

16.2     *Privacy and Data Protection.* Supplier agrees that GE Confidential Information shall be subject to the organizational, technical, and physical controls and other safeguards set out in the *"GE Privacy and Data Protection Appendix"* located at http://www.gesupplier.com/html/GEPolicies/download/GE_Privacy_and_Data_Protection_Appendix_(December_2015).pdf.            If Supplier has access to GE Restricted Data, Sensitive Personal Information, Controlled Data or a GE Information System as defined in the *GE Privacy and Data Protection Appendix,* Supplier agrees to apply such additional safeguards and to grant Buyer such additional rights as are set out in the *GE Privacy and Data Protection Appendix* relating to such data. In addition, Supplier understands and agrees that Buyer may require Supplier to provide certain personal information of Supplier's representatives to facilitate the performance of this Order, and that information shall be processed and maintained by Buyer as set forth in the *GE Privacy and Data Protection Appendix.*

16.3     *Publicity.* Supplier shall not make any announcement, take or release any photographs (except for its internal operation purposes for the manufacture and assembly of the goods), or release any information concerning this Order or with respect to its business relationship with Buyer or any Buyer Affiliate, to any third party except as required by applicable Law without Buyer or its Affiliate's prior written consent. Supplier agrees that it shall not, without prior written consent of Buyer or its Affiliates as applicable, (a) use in advertising, publicity or otherwise, the name, trade name, trademark logo or simulation there of Buyer or its Affiliate or the name of any officer or employee of Buyer or its Affiliates or (b) represent, directly or indirectly, that any product or any service provided by Supplier has been approved or endorsed by Buyer or its Affiliate.

**17.     INTELLECTUAL PROPERTY INDEMNIFICATION.** Supplier shall indemnify, defend and hold Buyer and Buyer's customers harmless from any and all claims against Buyer and/or Buyer's customers alleging intellectual property infringement of any patent, copyright, trademark, trade secret or other intellectual property rights of any third party arising out of the use, sale, importation, distribution, reproduction or licensing of any product, service, article or apparatus, or any part thereof constituting goods or services furnished under this Order, as well as any device or process necessarily resulting from the use thereof (the **"Indemnified IP"**), including the use, sale, importation, distribution, reproduction or licensing of such Indemnified IP, in foreseeable combinations with products or services not supplied by Supplier. Buyer shall notify Supplier promptly of any such suit, claim or proceeding and give Supplier authority and information and assistance (at Supplier's expense) for the defense of same, and Supplier shall pay all damages, costs and expenses incurred or awarded therein, including reasonable attorneys' fees. Notwithstanding the foregoing, any settlement of such suit, claim or proceeding shall be subject to Buyer's consent, such consent not to be unreasonably withheld. If use of any Indemnified IP is enjoined, Supplier shall, at Buyer's option and Supplier's expense, either: (a) procure for Buyer the right to continue using such Indemnified IP; (b) replace the same with a non-infringing equivalent; or (c) remove the Indemnified IP and/or halt such use of the Indemnified IP in providing goods and/or services under this Order and refund the purchase price to Buyer, and in all cases, Supplier shall be responsible for all related costs and expenses. Supplier agrees that it shall use commercially reasonable efforts to obtain an intellectual property infringement indemnity from its direct or indirect suppliers providing goods and/or services as part of the deliverables under this Order consistent with the intellectual property infringement indemnity it provides to Buyer in this Order.

**18.     BUSINESS CONTINUITY PLANNING AND SUPPLY CHAIN SECURITY.**

18.1     *Business Continuity Planning.* Supplier shall prepare, maintain and provide, at no additional cost to Buyer, a Business Continuity Plan ("BCP") satisfactory to Buyer and designed to ensure that Supplier can continue to provide the goods and/or services in accordance with this Order in the event of a disaster or other BCP-triggering event (as such events are defined in the applicable BCP). Supplier's BCP shall, at a minimum, provide for: (a) the retention and retrieval of data and files; (b) obtaining resources necessary for recovery, (c) appropriate continuity plans to maintain adequate levels of staffing required to provide the goods and services during a disruptive event; (d) procedures to activate an immediate, orderly response to emergency situations; (e) procedures to address potential disruptions to Supplier's supply chain; (f) a defined escalation process for notification of Buyer in the event of a BCP-triggering interruption; and (g) training for key Supplier Personnel who are responsible for monitoring and maintaining Supplier's continuity plans and records. Supplier shall maintain the BCP and test it at least annually. Upon Buyer's request, Supplier shall provide Buyer an executive summary of the test results and a report of corrective actions (including the timing for implementation) to be taken to remedy any deficiencies identified by such testing. Upon Buyer's request, and with reasonable advance notice and conducted in such a manner not to unduly interfere with Supplier's operations, Supplier shall give Buyer and its designated agents access to Supplier's designated representative(s) with detailed functional knowledge of Supplier's BCP and relevant subject matter.

18.2     *Supply Chain Security.* Supplier shall maintain a written security plan consistent with the Customs Trade Partnership Against Terrorism (**"C-TPAT"**) program of U.S. Customs and Border Protection, the Authorized Economic Operator for Security program of the European Union (**"EU AEO"**) and similar World Customs Organization SAFE Framework of Standards to Secure and Facilitate Global Trade (collectively, **"SAFE Framework Programs"**) and implement appropriate procedures pursuant to such plan (the **"Security Plan"**). Supplier shall: (a) communicate such SAFE Framework Programs recommendations to its sub-suppliers and transportation providers (**"Subtiers"**); (b) condition its relationship with those entities upon their implementation of a Security Plan; and (c) upon request of Buyer, Supplier shall certify to Buyer in writing that its Subtiers' Security Plans comply with all applicable SAFE Framework Programs.

**19.     PACKING, PRESERVATION AND MARKING.** Packing, preservation and marking shall be in accordance with Buyer's current version of General Requirements for Marking, Packaging, Preservation and Shipping P23E-AL-0255 , which Supplier acknowledges it has received or has been made available to Supplier on the internet at : http://www- https://www.gepower.com/content/dam/gepower-pw/global/en_US/documents/supplier-document-library/general-requirements-marking-preservation-packaging-shipping-p23e-al-0255-rev-r.pdfand on any specification or drawing or as specified on this Order, or if not specified, the best commercially accepted practice shall be used, which shall be consistent Law.

**20.     GOVERNING LAW AND DISPUTE RESOLUTION.**

20.1     *Governing Law.* This Order shall in all respects be governed by and interpreted in accordance with the substantive law of the State of New York, U.S., excluding its conflicts of law provisions. The parties exclude application of the United Nations Convention on Contracts for the International Sale of Goods.

20.2     *Dispute Resolution for U.S. Suppliers.* If Supplier is a permanent resident of the U.S., or a corporation, partnership or other entity existing under the laws of the U.S., and Supplier and Buyer have a controversy, dispute or difference arising out of this Order (**"Dispute"**), either party may initiate litigation. Litigation may be brought only in the U.S. District Court for the U.S. District Court for the Southern District of New York or, if such court lacks subject matter jurisdiction, in the Supreme Court of the State of New York in and for New York County. The parties submit to the jurisdiction of said courts and waive any defense of forum non conveniens. The parties waive all rights to jury trials.

20.3     *Dispute Resolution for Non-U.S. Suppliers.* If Supplier is a permanent resident of a country other than the U.S., or is a corporation, partnership or other entity existing under the laws of any country other than the U.S., and Supplier and Buyer have a Dispute, the parties agree to submit any such Dispute to settlement proceedings under the Alternative Dispute Resolution Rules (the **"ADR Rules"**) of the International Chamber of Commerce (**"ICC"**). If the Dispute has not been settled pursuant to the ADR Rules within forty-five (45) days following the filing of a request for ADR or within such other period as the parties may agree in writing, such Dispute shall be finally settled under the Rules of Arbitration and Conciliation of the ICC (the **"ICC Rules"**) by one or three arbitrators appointed in accordance with such ICC Rules. The place for arbitration shall be New York, New York, U.S., and proceedings shall be conducted in English. The award shall be final and binding on both Buyer and Supplier, and the parties hereby waive the right of appeal to any court for amendment or modification of the arbitrators' award.

**21.     ELECTRONIC COMMERCE.** Supplier agrees to participate in Buyer's current and future electronic commerce applications and initiatives. For purposes of this Order, each electronic message sent between the parties within such applications or initiatives shall be deemed: (a) "written" and a "writing"; (b) "signed" (in the manner below); and (c) an original business record when printed from electronic files or records established and maintained in the normal course of business. The parties expressly waive any right to object to the validity, effectiveness or enforceability of any such electronic message on the ground that a "statute of frauds" or any other Law or rule of evidence requires written, signed agreements. Any such electronic documents may be introduced as substantive evidence in any proceedings between the parties as business records as if originated and maintained in paper form. Neither party shall object to the admissibility of any such electronic document for any reason. By placing a name or other identifier on any such electronic message, the party doing so intends to sign the message with his/her signature attributed to the message content. The effect of each such message shall be determined by the electronic message content and by New York law, excluding any such Law requiring signed agreements or otherwise in conflict with this Section.

**22.     INDEPENDENT CONTRACTORS/ADDITIONAL SERVICE RELATED PROVISIONS.**

22.1     *Independent Contractor.* The relationship of Buyer and Supplier is that of independent contractors. Nothing in this Order shall be interpreted or construed as creating or establishing the relationship of employer and employee between Buyer and Supplier or Supplier Personnel. Buyer has no right to control directly or indirectly the terms and conditions of the employment of Supplier Personnel.

22.2     *Background Checks.* To the extent permissible by Law, and after securing appropriate written authorization from Supplier Personnel, Supplier shall, through the utilization of an authorized background checking agency  perform background checks as set out in http://www.gesupplier.com/html/GEPolicies/download/GE_Background_Check_Guidelines_(100115).pdf prior to (a) stationing any Supplier Personnel to perform services at any Buyer location, facility or work site (each a **" Buyer Site"**) (for purpose of clarity, "stationing" shall not include periodic attendance or visits to a Buyer Site); (b) granting Supplier Personnel access to Buyer networks; (c) assigning Supplier Personnel to duties that are directly related to the safe operation or security of a Buyer Site, which, if not performed properly, could cause a serious environmental, health or safety hazard; or (d) assigning Supplier Personnel to a Buyer Site that is designated in its entirety as "security sensitive," even though the work responsibilities, if performed in another context, would not be security sensitive.

**23.     CYBERSECURITY FOR GOODS WITH EXECUTABLE BINARY CODE.** Supplier agrees that all goods supplied under this Order that include executable binary code shall comply with the *Product Cybersecurity Appendix* located at http://www.gesupplier.com/html/GEPolicies/download/Product_Cybersecurity_Appendix_Rev_10_20_2015.pdf.

**24.     MISCELLANEOUS.** This Order, with documents as are expressly incorporated by reference, is intended as a complete, exclusive and final expression of the parties' agreement with respect to the subject matter herein and supersedes any prior or contemporaneous agreements, whether written or oral, between the parties.  No course of prior dealings and no usage of the trade shall be relevant to determine the meaning of this Order even though the accepting or acquiescing party has knowledge of the performance and opportunity

*5Ⅼ*

for objection. No claim or right arising out of a breach of this Order can be discharged in whole or in part by a waiver or renunciation unless supported by consideration and made in writing signed by the aggrieved party. Either party's failure to enforce any provision hereof shall not be construed to be a waiver of such provision or the right of such party thereafter to enforce each and every such provision. Buyer's rights and remedies in this Order are in addition to any other rights and remedies provided by Law, contract, or equity, and Buyer may exercise all such rights and remedies singularly, alternatively, successively or concurrently. Section headings are for convenience and shall not be given effect in interpretation of this Order. The term "including" shall mean and be construed as "including, but not limited to" or "including, without limitation", unless expressly stated to the contrary. The invalidity, in whole or in part, of any section or paragraph of this Order shall not affect the remainder of such section or paragraph or any other section or paragraph, which shall continue in full force and effect. Further, the parties agree to give any such section or paragraph deemed invalid, in whole or in part, a lawful interpretation that most closely reflects the original intention of Buyer and Supplier. All provisions or obligations contained in this Order, which by their nature or effect are required or intended to be observed, kept or performed after termination or expiration of this Order shall survive and remain binding upon and for the benefit of the parties, their successors (including successors by merger) and permitted assigns including, Sections 2.3(b) 4, 5, 7, 8, 9, 12, 14, 15, 16, 17, 21 and 24.